**No. 26-2210**

**UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

STATE OF NEW JERSEY, *et al.*,

*Plaintiffs-Appellees,*

v.

U.S. OFFICE OF MANAGEMENT AND BUDGET, *et al.*,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Massachusetts
(Talwani, J.) in No. 25-cv-11816

**PLAINTIFFS-APPELLEES' OPPOSITION TO**
**MOTION FOR STAY PENDING APPEAL**

*(Counsel listed in signature block)*

## TABLE OF CONTENTS


Introduction ........ 1

Background ........ 4

Argument ........ 7

- I. Defendants Fail To Demonstrate Irreparable Injury, And The Equities Weigh Decisively Against A Stay ........ 7
- II. Defendants Are Unlikely To Succeed On The Merits. ........ 10
  - A. The District Court Correctly Held That Plaintiffs Challenged Final Agency Action. ........ 10
  - B. The District Court Correctly Interpreted The Clause. ........ 16

Conclusion ........ 22

# TABLE OF AUTHORITIES

**PAGE(S)**

## Cases

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967) .......... 11

*Arevalo v. Ashcroft*,
344 F.3d 1 (1st Cir. 2003) .......... 17

*Badger Cath., Inc. v. Walsh*,
620 F.3d 775 (7th Cir. 2010) .......... 8

*Barrick Goldstrike Mines Inc. v. Browner*,
215 F.3d 45 (D.C. Cir. 2000) .......... 15

*Beame v. Friends of the Earth*,
434 U.S. 1310 (1977) .......... 8

*Beecham v. United States*,
511 U.S. 368 (1994) .......... 18

*Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*,
972 F.3d 83 (D.C. Cir. 2020) .......... 15

*California v. U.S. Dep't of Educ.*,
--- F. Supp. 3d ---, 2026 WL 2754968 (D. Mass. Sept. 17, 2026) .......... 16

*Chamber of Com. of U.S. v. FEC*,
69 F.3d 600 (D.C. Cir. 1995) .......... 11

*Ciba-Geigy Corp. v. EPA*,
801 F.2d 430 (D.C. Cir. 1986) .......... 13

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) .......... 11

*Dep't of Educ. v. California*,
604 U.S. 650 (2025) .......... 9

*DRG Funding Corp. v. Secretary of HUD*,
76 F.3d 1212 (D.C. Cir. 1996) .......... 14

*Fischer v. United States*,
603 U.S. 480 (2024) .......... 21

*Harper v. Werfel*,
118 F.4th 100 (1st Cir. 2024) .......... 13, 14

*Illinois v. U.S. Dep't of Homeland Sec.*,
No. 26-00485 (D.R.I. Oct. 2, 2026) .......... 14

*Kentucky v. Yellen*,
67 F.4th 322 (6th Cir. 2023) .......... 21

*Kristensen v. McGrath*,
179 F.2d 796 (D.C. Cir. 1949) .......... 12

*Landor v. Louisiana Dep't of Corr. & Pub. Safety*,
609 U.S. 59 (2026) .......... 22

*N.H. Hemp Council, Inc. v. Marshall*,
203 F.3d 1 (1st Cir. 2000) .......... 12

*N.H. Lottery Comm'n v. Rosen*,
986 F.3d 38 (1st Cir. 2021) .......... 12, 13, 16

*N.H. Youth Movement v. Scanlan*,
191 F.4th 41 (1st Cir. 2026) .......... 8

*Nat'l Institutes of Health v. Am. Pub. Health Ass'n*,
145 S. Ct. 2658 (2025) .......... 9

*New York v. Trump*,
133 F.4th 51 (1st Cir. 2025) .......... 9

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981) .......... 10, 21

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015) .......... 13

*R.I.L-R v. Johnson*,
80 F. Supp. 3d 164 (D.D.C. 2015) .......... 15

*Rhode Island v. Trump*,
155 F.4th 35 (1st Cir. 2025) .......... 7, 10

*Ruckelshaus v. Monsanto Co.*,
463 U.S. 1315 (1983) .......... 7

*Schoenthal v. Raoul*,
150 F.4th 889 (7th Cir. 2025) .......... 16

*Sig Sauer, Inc. v. Brandon*,
826 F.3d 598 (1st Cir. 2016) .......... 13

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016) .......... 16

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*,
186 F.4th 25 (1st Cir. 2026) .......... 15

**Statutes**

28 U.S.C. § 2201 .......... 8

5 U.S.C. § 551 .......... 11, 13

5 U.S.C. § 703 .......... 12

5 U.S.C. § 706 .......................................................................................... 12

**Other Authorities**

Exec. Order No. 14,332 § 6(b) ............................................................... 15

H. R. Rep. No. 1980, 79th Cong., 2d Sess. (1946) .................................. 11

S. Rep. No. 752, 79th Cong., 1st Sess. (1945) ......................................... 11

**Rules**

1st Cir. R. 27.0(b) ....................................................................................... 8

**Regulations**

2 C.F.R. § 200.202 ....................................................................................... 9

2 C.F.R. § 200.340 ............................................................................... passim

85 Fed. Reg. 49506 (Aug. 13, 2020)(2020 Final Rule) ........................ 19, 20

90 Fed. Reg. 38929 (Aug. 7, 2025) ......................................................... 15

## INTRODUCTION

Since January 2025, the Federal Government has mounted an unprecedented and unlawful campaign to terminate billions of dollars in critical federal funding appropriated by Congress. At the President's direction, federal agencies terminated thousands of grants they previously awarded to Plaintiffs—20 States, three Governors, and the District of Columbia—for projects to combat violent crime, educate students, safeguard public health, protect clean drinking water, conduct life-saving medical research, address food insecurity, ensure access to unemployment benefits, and much more.

The Federal Government has carried out this extraordinary campaign using a single subclause buried in federal regulations promulgated by the Office of Management and Budget (OMB) and incorporated verbatim into defendant agencies' regulations. This provision, the "Termination Clause" or the "Clause," states that agencies may terminate grants if an award "no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4) (2024); 2 C.F.R. § 200.340(a)(2) (2021). Despite taking the opposite view for years, the Federal Government now says that the Clause is essentially an at-will termination provision, allowing federal agencies to cancel funding based on whatever new "agency priorities" they have on any given day. Because Plaintiffs still had billions in active grants with the same federal agencies—and were continuing to apply for and accept additional grants—Plaintiffs sued under the

Administrative Procedure Act (APA) and Declaratory Judgment Act (DJA), seeking a declaratory judgment that the Clause does not allow agencies to terminate a grant based on new priorities identified after the award is made.

More than three months ago, the district court agreed with Plaintiffs and issued a declaratory judgment—based on the regulation's plain text, history, structure, and constitutional principles—that the Termination Clause "do[es] not allow terminations of awards based on new program goals or agency priorities that an agency identifies after granting the award." App.035.[1] Defendants declined to seek immediate relief from that binding order, occasioned months of delay in memorializing a final judgment, and delayed additional weeks in seeking a stay before the district court. Now, Defendants claim that they urgently need a stay from this Court because they have an interest in "terminating awards that 'no longer effectuate the program goals or agency priorities' of the current Administration." Mot.24.

Defendants do not come close to meeting their burden of establishing a need for such extraordinary relief. Their months-long delay in seeking relief alone is enough to deny a stay. But the equities strongly favor

[1] "Mot." refers to Defendants' Stay Motion (using the page numbers in the ECF header), "App." refers to Defendants' Appendix in support of their Stay Motion with this Court, "PA" refers to Plaintiffs' Addendum appended hereto.

Plaintiffs in other respects too. Defendants retain the authority to not only lawfully terminate non-compliant grants, but also to award new grants consistent with the Administration's new priorities and applicable law. And the declaratory judgment does not enjoin Defendants from terminating particular grants or require them to fund any new grants. Rather, it simply makes clear that Defendants cannot invoke the Clause to eliminate existing awards midstream based on priorities that were not established at the time of the award. By contrast, Plaintiffs and their residents would suffer the devastating loss of critical federal funds if Defendants could arbitrarily terminate awards based on abrupt changes in agency preferences not known at the time of the award.

Nor can Defendants succeed on the merits. As the district court correctly held, Plaintiffs properly challenged final agency action. Defendants do not dispute that the Clause itself is final agency action, and Plaintiffs' challenge was plainly directed toward the Clause. The district court also correctly held that the Clause does not give Defendants carte blanche to terminate billions of dollars in grants on a whim. The regulation's text, structure, history, and constitutional principles demonstrate that the Clause does not authorize federal agencies to terminate grants based on agency priorities not identified at the time of the award.

This Court should deny the stay.

## BACKGROUND

In the days and weeks following his inauguration, President Trump issued a series of Executive Orders directing federal agencies to terminate existing grant funding to a range of recipients, including Plaintiffs, based on the Executive Branch's new policy preferences. App.056-58. To carry out the President's directives, Defendants terminated thousands of Plaintiffs' grants representing billions in federal funding for vital programs. App.008-09; App.038-39; App.059-104. Defendants issued boilerplate letters citing the Clause and stating that the grants "no longer effectuate[] agency priorities." *Id.* Those letters relied on *new* agency priorities identified after the grants were accepted and performance had begun, and sometimes explicitly stated that they were "rejecting the program goals established at the time the grants were issued." *Id.*

Because Plaintiffs had thousands of active grants with Defendants and continued to apply for more grants, they filed a lawsuit in June 2025 seeking a forward-looking declaratory judgment that the Clause does not "provide federal agencies with virtually unfettered authority to withhold federal funding any time they no longer wish to support the programs for which Congress has appropriated funding." App.038 (citing 2 C.F.R. § 200.340(a)(4)). Plaintiffs asserted that the Clause allows terminations only where an award no longer effectuates the priorities established when the award was made. App.053.

The amended complaint asserted three causes of action. Count I—the only claim at issue on appeal—focused on the Clause itself and sought a declaratory judgment under the APA and DJA clarifying the "limitations on the Clause." App.111. Plaintiffs asked for a declaration that the Clause does not permit "terminations based on changed agency priorities identified after the time of the federal award."[2] App.110. Counts II and III were pleaded in the alternative. Count II was directed at Defendants' overarching decision to "terminate grants based on new 'agency priorities' identified after the grants have been awarded" and sought an order vacating that decision. App.112-14. Like Count I, Count III was directed at the Clause itself. If "the Court disagree[d] with Plaintiffs' interpretation (as set forth in Count I) of the language of the Clause," Count III sought "an order and judgment holding unlawful and setting aside the Clause." App.114-17. Plaintiffs moved for summary judgment on Count I, while Defendants cross-moved for dismissal of all claims. App.005.

On July 17, 2026, the district court granted summary judgment on Count I. App.004-35. The court held that Plaintiffs had standing and the case was ripe for review given Defendants' widespread use of the Clause for prior terminations and the substantial threat of similar terminations. App.016-21. The court also held that Plaintiffs properly challenged final

[2] Count I also asked for a declaration on two other points that Defendants eventually conceded below. App.109; App.022.

agency action under the APA: because Plaintiffs asked "the court to declare the meaning of the Termination Clause," the declaratory judgment was properly "directed to the regulation." App.021-22.

On the merits, the district court carefully reviewed "the plain language, regulatory scheme, regulatory history, [and] the Constitution's Spending Clause," App.023, and issued a declaratory judgment that "the Termination Clause does not permit agencies to terminate grants based on program goals and agency priorities identified after grants were awarded," App.035. In granting summary judgment on Count I, the district court requested that Plaintiffs "promptly advise" as to how they planned to proceed as to Counts II and III, which were pled in the alternative. App.005 n.5.

After the decision, the parties conferred and reached an agreement in principle on August 7, 2026 to file a joint motion for partial final judgment on Count I under Rule 54(b). PA010. But Defendants did not move promptly to effectuate that agreement. On August 12, Defendants agreed to draft the joint motion. *Id.* On August 26, however, they asked that Plaintiffs do so instead. *Id.* On September 10, Plaintiffs circulated a draft motion to Defendants. *Id.* Still Defendants did not respond promptly. Because of the delay, the district court set a status conference on September 22 and established a deadline for the submission of the joint motion. App.155. On October 1, three weeks after Plaintiffs had sent a draft, Defendants finally provided Plaintiffs with comments on their joint motion.

PA010. Plaintiffs then filed the parties' joint motion on October 6, the district court entered partial final judgment the next day, and Plaintiffs dismissed Counts II and III without prejudice. App.155-56.

More than two weeks later, Defendants filed their notice of appeal and a motion for a stay. App.156. In a reasoned opinion, the district court denied the stay on November 3. PA001-08.

## ARGUMENT

A stay pending appeal is "extraordinary" relief. *Rhode Island v. Trump*, 155 F.4th 35, 41 (1st Cir. 2025). Because such a stay "is an intrusion into the ordinary processes of administration and judicial review," it is never "granted as a matter of right." *Id.* Defendants "bear the burden of demonstrating" their entitlement to a stay pending appeal. *Id.* They must make a "strong showing" that they are "likely to succeed on the merits," that they will be "irreparably injured absent a stay," and that the equities and public interest weigh in their favor. *Id.* "The first two factors are the most critical," *id.*, and "an applicant's likelihood of success on the merits need not be considered" if "the applicant fails to show irreparable injury from the denial of the stay." *Ruckelshaus v. Monsanto Co.*, 463 U.S. 1315, 1317 (1983) (Blackmun, J., in chambers).

### I. Defendants Fail To Demonstrate Irreparable Injury, And The Equities Weigh Decisively Against A Stay.

Defendants have not shown that they will be irreparably injured absent a stay, and the equities weigh decisively against a stay.

To start, Defendants' "leisurely pursuit of a stay" following the district court's order fatally undermines their claim of irreparable harm. *See N.H. Youth Movement v. Scanlan*, 191 F.4th 41, 43 (1st Cir. 2026) (denying stay "even assuming" appellants were likely to succeed on the merits because they waited three weeks and did not "request expedited briefing"). Defendants received the district court's declaratory judgment on July 17, 2026. App.004-35. That order had "the force and effect of a final judgment" upon issuance. 28 U.S.C. § 2201(a); *Badger Cath., Inc. v. Walsh,* 620 F.3d 775, 782 (7th Cir. 2010) ("[A] declaratory judgment is a real judgment, not just a bit of friendly advice[.]"). Yet Defendants took no action to seek relief from that order until more than three months later. *See supra* pp.6-7. As the district court found, Defendants themselves "were responsible for the delay after the court issued its" declaratory judgment in July. PA007 n.6. And even after the district court entered judgment in early October, Defendants still waited more than two weeks to appeal and seek a stay. Defendants' lackadaisical approach "vitiates much of the force of their allegations of irreparable harm," *Beame v. Friends of the Earth*, 434 U.S. 1310, 1313 (1977) (Marshall, J., in chambers), and is alone "sufficient grounds to deny a stay," *Scanlan*, 191 F.4th at 43; *see also* 1st Cir. R. 27.0(b).[3]

[3] Defendants puzzlingly critique Plaintiffs' "unexplained delay" in filing this action. Mot.25. But it is *Defendants* who seek a stay. So it is *their* burden to show a stay is warranted.

Dispositive delays aside, Defendants have not shown irreparable harm. The district court's carefully cabined declaratory judgment simply stated the law: Defendants cannot terminate grants based on agency priorities that were unknown at the time those grants were awarded. So Defendants retain substantial flexibility to control grant monies. As the district court noted, the declaratory judgment did not "enjoin Defendants from terminating grants for any lawful reasons." PA004. They can still terminate grants, for example, when a recipient "fails to comply with the terms and conditions of the Federal award." *See* 2 C.F.R. § 200.340(a)(1). The declaratory judgment also did not "enforce any obligation to pay money" by, for example, "vacating the Government's termination of various [] grants." *Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2660 (2025). Nor does it require Defendants to "pay out past-due grant obligations." *Dep't of Educ. v. California*, 604 U.S. 650, 650 (2025). And it did not "interfere with Defendants' ability to set new program goals and priorities for any new grants awarded." PA005; 2 C.F.R. § 200.202(a)(1). In short, Defendants' generalized, abstract harms are not enough.[4] *See New York v. Trump*, 133 F.4th 51, 72 (1st Cir. 2025).

---

[4] Defendants do not develop any specific argument about the "severe separation-of-powers harm" they claim. Mot.25. They neither suggest any specific policy they have been unable to pursue nor explain how continuing to fund already-awarded grants could implicate a legitimate separation-of-powers concern.

Plaintiffs, by contrast, would suffer substantial injury from a stay. As the district court found, Plaintiffs have a strong interest in protecting their residents from the harms inflicted by additional unlawful grant terminations. PA005-06. As the Supreme Court has long recognized, Plaintiffs must be able to plan their budgets "cognizant of the consequences of their participation" in federal grant programs. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). For similar reasons, there is a substantial public interest in denying the stay. Clarity as to when the Federal Government may halt critical federal funding avoids future disputes and guides Defendants in the lawful exercise of their authority. *See Rhode Island*, 155 F.4th at 50. So the equities, public interest, and lack of irreparable harm weigh decisively in favor of Plaintiffs.

## II. Defendants Are Unlikely To Succeed On The Merits.

Defendants also cannot make a strong showing that they are likely to succeed on the merits. As the district court correctly held, Plaintiffs appropriately challenged final agency action, and the Clause does not allow Defendants to terminate grant awards based on new agency priorities that were not identified at the time of the award.

### A. The District Court Correctly Held That Plaintiffs Challenged Final Agency Action.

It is well-established under the APA that a plaintiff may seek a pre-enforcement declaratory judgment directed to the meaning or applicability of a regulation. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 149, 152-

54 (1967); *Chamber of Com. of U.S. v. FEC*, 69 F.3d 600, 603-04 (D.C. Cir. 1995) (similar). After all, Congress made clear when it enacted the APA that the "[d]eclaratory judgment procedure" would be available before other relief "to determine the application or threatened application" of any rule. H. R. Rep. No. 1980, 79th Cong., 2d Sess., at 276, 278 (1946); *accord* S. Rep. No. 752, 79th Cong., 1st Sess., at 212-13 (1945). So it is no exaggeration to say that "preenforcement review of agency rules" is "the norm, not the exception." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 840 (2024) (Kavanaugh, J., concurring).

Here, everyone agrees that "[t]he promulgation of a rule like the Termination Clause is final agency action." Mot.12. As Defendants themselves explained, the Clause "shape[s] the contours of the legal and contractual relationship between grantor and grantee." No. 25-11816, ECF No. 89 at 28 (D. Mass. Sept. 11, 2025). The only question is whether Count I challenged the Clause in those regulations. It did. As the district court recognized, Plaintiffs "ask[ed] the court to declare the meaning of the Termination Clause itself," so relief was properly "directed to the regulation, not Defendants' actions implementing the regulation." App.021-22. Indeed, Plaintiffs expressly identified "OMB's regulations containing the Clause and the Agency Defendants' parallel regulations" incorporating the Clause as the relevant "final agency action." App.107, 114 (citing 5 U.S.C. § 551(13)). That was as true for Count III—which Defendants

agree involves final agency action—as it was for Count I. *Compare id.*, *with* Mot.12-13.

It does not matter that Count I sought to clarify the limited scope of the Clause rather than vacate "the Termination Clause as unlawful" or enjoin "the federal government from invoking it." Mot.13. In their complaint, Plaintiffs sought both a declaratory judgment (in Count I) and vacatur of the Clause (in Count III), and were ultimately awarded the former in lieu of the more drastic remedy of vacatur. The APA supports this measured approach. It contemplates "actions for declaratory judgments," 5 U.S.C. § 703, and directs courts to decide "the meaning or applicability" of agency actions like regulations, *id.* § 706. And courts frequently issue declaratory judgments determining the meaning of legal provisions without declaring them unlawful. *See, e.g.*, *N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 61-62 (1st Cir. 2021) (declaratory judgment as to meaning of the federal Wire Act); *cf. N.H. Hemp Council, Inc. v. Marshall*, 203 F.3d 1, 8 (1st Cir. 2000). Indeed, the APA was designed "to simplify and make more flexible the avenues to judicial relief," consistent with the "generally liberal attitude of Congress" as to "the declaratory judgment procedure." *Kristensen v. McGrath*, 179 F.2d 796, 799-800 (D.C. Cir. 1949). So where a regulation could have some valid applications if interpreted correctly, the APA and DJA do not force vacatur or an injunction over the more limited remedy of a declaratory judgment. In

fact, a declaration is preferable where, as here, it provides an "adequate [remedy] under the circumstances." *N.H. Lottery*, 986 F.3d at 62.

But even if Defendants were correct that Count I challenges their interpretation of the Termination Clause, it would make little difference. Mot.13-14. Where agency interpretations are sufficiently definitive and have legal consequences, courts have long found that they are final and subject to APA review.[5] *See, e.g.*, *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 105-06 (2015) (recognizing "an agency's decision to issue an interpretive rule" is subject to APA review); *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 600 n.1 (1st Cir. 2016) ("ATF's issuance of a classification letter [was] a 'final agency action[.]'"); *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436-37 (D.C. Cir. 1986) (agency position statement was final where "no indication that it was subject to further agency consideration or possible modification"). That is true here.

Defendants' interpretation is one from which "legal consequences will flow." *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024). Just like the Clause itself, Defendants' interpretation of the Clause "shape[s] the contours of the legal and contractual relationship between grantor and grantee" by allowing them to terminate grants on a whim. No. 25-11816,

---

[5] Agency action is defined to include "an agency rule," 5 U.S.C. § 551(13), and "rule" is defined to include "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy," *id.* § 551(4).

ECF No. 89 at 28 (D. Mass. Sept. 11, 2025). That is no secret: Defendants specifically argue that a stay is needed because they are "impede[d]" from terminating awards based on the new priorities "of the current Administration." Mot.24. And Plaintiffs have thousands of currently active grants with Defendants that are potentially subject to termination on those grounds. So if the Clause permits Defendants' version of at-will termination, that has sweeping legal consequences for the billions of dollars of funding Plaintiffs rely on.

Defendants' interpretation is also definitive, not "tentative" or "interlocutory."[6] *Harper*, 118 F.4th at 116. Defendants have relied on their interpretation of the Clause to terminate thousands of grants collectively implicating billions of dollars in federal funding. App.059-104. They have expressly incorporated their particular interpretation of the Clause into new grant awards. *See* No. 25-11816, ECF No. 98 at 24 (D. Mass. Oct. 17, 2025); *Illinois v. U.S. Dep't of Homeland Sec.*, No. 26-00485, ECF No. 44 ¶ 8 (D.R.I. Oct. 2, 2026) (detailing "new terms on substantially all 2026 FEMA funding" that purport to permit terminations based on "newly-defined program goals and agency priorities"). The President has expressly directed agencies to ensure that "the terms and conditions of

---

[6] Defendants' cited case is inapplicable; it involved a direction to an administrative law judge regarding an administrative process, which was "intermediate" and did "not end the controversy." *DRG Funding Corp. v. Secretary of HUD*, 76 F.3d 1212, 1214-15 (D.C. Cir. 1996).

existing discretionary grants" permit "immediate termination for convenience" based on shifting "agency priorities." Exec. Order No. 14,332 § 6(b), 90 Fed. Reg. 38929, 38933 (Aug. 7, 2025). And Defendants continue to vigorously defend that interpretation here. Mot.15-24. As Defendants stated at oral argument in the district court, "the government interprets this regulation to allow for termination of a grant" based on "agency priorities that have changed during the grant-making process." PA045. In their own words: "[T]hat is the government's interpretation of th[e] reg[ulation]." *Id.*

All of this is more than enough for finality. Courts have found agency interpretations "final" where, as here, counsel "admitted at oral argument" that an agency interpretation is not "of a merely tentative or interlocutory nature." *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 47 (D.C. Cir. 2000). And certainly if "a hodgepodge of memos and emails" is enough for final agency action, then there is more than enough for final agency action here.[7] *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 186 F.4th 25, 42 (1st Cir. 2026).

[7] It is irrelevant whether the interpretive decision is memorialized in a single writing. An agency decision "need not be in writing to be final and judicially reviewable." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015); *accord Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir. 2020). Even Defendants acknowledged at oral argument that it is not "dispositive" whether the challenge is to "a written policy or an unwritten policy." PA044.

In the end, whether the final agency action is the Clause or Defendants' interpretation of the Clause, the district court properly issued a declaratory judgment under the APA and DJA. And the latter should not be overlooked: when a "claim satisfies Article III's case-or-controversy requirement," "[n]early a century of case law establishes that Plaintiffs can bring a standalone claim pursuant to the procedures in the Declaratory Judgment Act." *Schoenthal v. Raoul*, 150 F.4th 889, 901 (7th Cir. 2025). That is why this Court has issued a declaratory judgment under the DJA alone. *See N.H. Lottery*, 986 F.3d at 62. Regardless of approach, Plaintiffs need not wait for Defendants "to drop the hammer" on billions more in unlawful grant terminations "in order to have their day in court." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 600 (2016).

### B. The District Court Correctly Interpreted The Clause.

As multiple district courts in this Circuit have correctly concluded, the Clause does not authorize federal agencies to terminate grants based on new agency priorities that were not identified at the time the award was made. *See, e.g.*, *California v. U.S. Dep't of Educ.*, --- F. Supp. 3d ---, 2026 WL 2754968, at *31 (D. Mass. Sept. 17, 2026).

Start with text and structure. The Clause permits an agency to terminate a grant "if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). Read together, two key terms in the Clause—"no longer" (in "no longer effectuates") and "the" (in "the … agency priorities")—show that the only priorities an agency may

invoke are those that existed when the award was made. As Defendants concede, the phrase "no longer effectuates" "makes clear that the regulation contemplates a change in circumstances between when the grant was awarded and when the agency decides to terminate the grant." Mot.15-16. But the Clause's use of the definite article "the" preceding "agency priorities" provides the yardstick to measure that change: a *specific* set of program goals and agency priorities, namely those that existed when the award was made. If agencies were permitted to terminate based on "shift[ing]" goals or priorities, *id.* at 16, then the reference to "*the* program goals or agency priorities" would make little sense. Because Defendants' interpretation would require this Court to ignore the definite article "the," it is wrong. After all, provisions "should be interpreted, whenever possible, to give every word and phrase some operative effect." *Arevalo v. Ashcroft*, 344 F.3d 1, 7 (1st Cir. 2003).

Defendants' invocation of past-tense language in preceding subsection (a)(3) does not support their position that the Clause in subsection (a)(4) requires a "here-and-now analysis" of whether the award effectuates "current[]" agency priorities. Mot.17. Both subsections involve backward-looking inquiries, and the difference in tense is explained by the two subsections' differing purposes. Subsection (a)(3) applies when a *grant recipient* partially terminates an award; it allows the agency to terminate the rest of the award if it "will not accomplish the purposes for which the Federal award was made." 2 C.F.R. § 200.340(a)(3). The

language of subsection (a)(3) thus clarifies that it was not the *recipient*'s purpose in using funding that mattered, but instead the "purposes for which the Federal award was made." Subsection (a)(4), on the other hand, regulates the *agency*'s authority to terminate an award based on whether the award continues to effectuate "the program goals and agency priorities." The provision's focus is on the agency's program goals and priorities—not the recipient's—so there was no need to clarify that the agency's inquiry should focus on *its* goals and priorities when the award was made.

Other textual clues—specifically the use of "no longer effectuates"—make subsection (a)(3)'s backward-looking approach clear. As Defendants acknowledge, "no longer effectuates" contemplates "a change in circumstances between when the grant was awarded and when the agency decides to terminate the grant." Mot.15-16. That is a necessarily backward-looking inquiry. And Defendants fail to identify any principle that requires drafters to use the past tense to convey an otherwise clear backward-looking assessment, just because another subsection happens to use past tense. If anything, the backward-looking nature of subsection (a)(3) reinforces the backward-looking nature of subsection (a)(4). *See Beecham v. United States*, 511 U.S. 368, 371 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well.").

The plain text of the Clause thus preserves agencies' flexibility to "support implementation of Administration priorities" at the time of the

grant while protecting against arbitrary agency terminations that would disrupt billions of dollars in previously awarded grant money. Mot.18 (quoting 85 Fed. Reg. 49506, 49506 (Aug. 13, 2020) (2020 Final Rule)). If an agency awarded a grant to solve a particular problem, but that issue "has been resolved in some other way," then the Clause would permit termination because the grant would no longer further the agency's contemporaneously stated priorities given that the problem identified for resolution is no longer a problem. Mot.17. And if an agency needed to quickly "reorient its priorities," nothing in the Clause prevents the agency from auditing grants to ensure they still meet the priorities that governed their award, limiting new grants to those that further the agency's revised objectives, or appropriately relying on other subsections to terminate grants. But the Clause does not permit agencies to engage in at-will termination of billions of dollars previously awarded to Plaintiffs and other grantees.

The Clause's regulatory history likewise undermines Defendants' claims. When the Clause was added in 2020, OMB explained that the new language was included "to ensure that Federal awarding agencies prioritize *ongoing support* to Federal awards *that meet program goals*." 85 Fed. Reg. at 49,507 (emphases added). And the guidance included two scenarios in which the Clause would permit termination: where "additional evidence reveals that a specific award objective is ineffective at achieving program goals" or where "additional evidence may cause the

Federal awarding agency to significantly question the feasibility of the intended objective of the award." *Id.* For example, the EPA could use the Clause to terminate an existing grant to clean up groundwater pollution with a particular technology if a new study reveals that this technology does not in fact clean up pollution. In that scenario, "additional evidence" shows that the project (using the technology to clean up groundwater) is ineffective at accomplishing the stated agency priority (cleaning up groundwater). But nothing indicates that the EPA could abruptly stop funding the cleanup project midway because it has lost interest in water quality. To the contrary, OMB reassured commenters that the Clause would not permit agencies "to terminate grants arbitrarily." 85 Fed. Reg. at 49,509. Even if, as Defendants contend, those commenters (incorrectly) interpreted the Clause consistent with Defendants' reading, OMB's definitive rejection of that reading is strong evidence against it. *See* Mot.17.

Other aspects of the regulatory scheme—which emphasize agency consistency, transparency, and the clear articulation of agency priorities—further undermine Defendants' position. As the district court recognized, many surrounding regulatory provisions make abundantly clear that recipients must be put on notice of the goals and priorities they are expected to further *before* awards are made. *See* App.027-28. There would be no point in such extensive disclosures if agencies could reverse course at any time. *Contra* Mot.20. Nor would there be much incentive for

grantees to pursue agency objectives if their efforts could be so swiftly mooted by an agency about-face.

With this regulatory history in mind, Defendants' expansive interpretation of the Clause would "render[] an unnerving amount of [] text mere surplusage." *Fischer v. United States*, 603 U.S. 480, 498 (2024). As the district court correctly explained, it would no longer be necessary for agencies to seek consent from the recipient to terminate an award, *see* 2 C.F.R. § 200.340(a)(2), or, if a grantee seeks partial termination, assess whether the remaining portion of the award meets original program goals, *see id.* § 200.340(a)(3). Agencies could simply decide that they "no longer wish to fund a grantee," App.26 n.10, and rubberstamp that decision by incanting a change in "agency priorities." Nor does it matter whether Defendants' reading is completely or only partially redundant. Mot.21. Either way, surplusage is "disfavored," and a "construction that creates substantially less of it"—as Plaintiffs' does—"is better than a construction that creates substantially more." *Fischer*, 603 U.S. at 496.

This conclusion is reinforced by constitutional principles. Under the Spending Clause, Congress exceeds its power by surprising "States with post acceptance or 'retroactive' conditions." *Pennhurst*, 451 U.S. at 25. "This threshold requirement—that Congress speak clearly as to a condition it imposes"—ensures that States "know[] what the consequences are" before accepting federal funds. *Kentucky v. Yellen*, 67 F.4th 322, 324 (6th Cir. 2023); *see Landor v. Louisiana Dep't of Corr. & Pub. Safety*, 609 U.S.

59, 69 (2026). Here, Defendants do not contend that Congress authorized at-will grant termination, or that any such statute would comply with the Spending Clause. They instead assert that the Clause "is not a funding condition." Mot.23. But as the district court correctly recognized, the Clause "impose[s] [funding] conditions on grants" by permitting them to be terminated if they "no longer effectuate program goals or agency priorities." App.34 (quoting 2 C.F.R. § 200.340(a)(4)). And if agencies can terminate based on agency priorities unknown to the State upon accepting the grant, States will lack the constitutionally required notice. *Id.*

## CONCLUSION

This Court should deny a stay pending appeal.

**JENNIFER DAVENPORT**
ATTORNEY GENERAL OF
NEW JERSEY

By: /s/ Bassam F. Gergi
Sundeep Iyer*
*Solicitor General*
Stephen Ehrlich*
*Deputy Solicitor General*
Bassam F. Gergi
September R. McCarthy*
*Deputy Attorneys General*
25 Market Street
Trenton, NJ 08625
(862) 350-5800
bassam.gergi@njoag.gov

*Counsel for the State of New Jersey*

**LETITIA JAMES**
ATTORNEY GENERAL OF NEW YORK

By: /s/ Judith N. Vale
Judith N. Vale
*Deputy Solicitor General*
Mark Grube
*Senior Assistant Solicitor General*
Rabia Muqaddam
*Special Counsel for Federal Initiatives*
Jessica Ranucci
*Special Counsel*
28 Liberty Street
New York, NY 10005
(212) 416-6274
judith.vale@ag.ny.gov

*Counsel for the State of New York*

**ANDREA JOY CAMPBELL**
ATTORNEY GENERAL OF
MASSACHUSETTS

By: /s/ Katherine B. Dirks
Katherine B. Dirks
*Chief State Trial Counsel*
Anna J. Lumelsky
*Deputy State Solicitor*
Savannah Arguello
Jak Kundl*
*Assistant Attorneys General*
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**KRISTIN K. MAYES**
ATTORNEY GENERAL OF
ARIZONA

By: */s/ Syreeta A. Tyrell*
Syreeta A. Tyrell
*Senior Litigation Counsel*
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
syreeta.tyrell@azag.gov

*Counsel for the State of Arizona*

**ROB BONTA**
ATTORNEY GENERAL
OF CALIFORNIA

Harald H. Kirn*
*Deputy Attorney General*
455 Golden Gate Av., Suite 11000
San Francisco, CA 94102
(415) 510-4400
harald.kirn@doj.ca.gov

*Counsel for the State of California*

**PHILIP J. WEISER**
ATTORNEY GENERAL OF
COLORADO

By: */s/ David Moskowitz*
David Moskowitz
*Deputy Solicitor General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov

*Counsel for the State of Colorado*

**WILLIAM TONG**
ATTORNEY GENERAL OF
CONNECTICUT

By: */s/ Michael K. Skold*
Michael K. Skold
*Solicitor General*
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5020
michael.skold@ct.gov

*Counsel for the State of Connecticut*

**KATHLEEN JENNINGS**
ATTORNEY GENERAL OF DELAWARE

By: */s/ Ian R. Liston*
Ian R. Liston
*Director of Impact Litigation*
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
ian.liston@delaware.gov

*Counsel for the State of Delaware*

**BRIAN L. SCHWALB**
ATTORNEY GENERAL FOR THE DISTRICT OF COLUMBIA

By: */s/ Mitchell P. Reich*
Mitchell P. Reich
*Senior Counsel to the Attorney General*
400 Sixth Street, NW
Washington, DC 20001
(202) 279-1261
mitchell.reich@dc.gov

*Counsel for the District of Columbia*

**ANNE E. LOPEZ**
ATTORNEY GENERAL OF HAWAIʻI

By: */s/ Kalikoʻonālani D. Fernandes*
Kalikoʻonālani D. Fernandes
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

**KWAME RAOUL**
ATTORNEY GENERAL OF ILLINOIS

By: */s/ Alex Hemmer*
Alex Hemmer
*Deputy Solicitor General*
115 S. LaSalle Street
Chicago, IL 60603
(773) 590-7932
alex.hemmer@ilag.gov

*Counsel for the State of Illinois*

**LAURA KELLY**
In Her Official Capacity as
Governor of the
State of Kansas

Justin H. Whitten*
*General Counsel*
Office of the Kansas Governor
300 SW 10th Ave., Room 541-E
Topeka, KS 66612
(785) 296-3930
justin.h.whitten@ks.gov

*Counsel for Governor Laura Kelly*

**OFFICE OF THE GOVERNOR *ex rel.* ANDY BESHEAR**
In His Official Capacity as
Governor of the
Commonwealth of Kentucky

By: */s/ S. Travis Mayo*
S. Travis Mayo
*General Counsel*
Sam Flynn*
*Chief Deputy General Counsel*
Laura C. Tipton*
*Deputy General Counsel*
Office of the Kentucky Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov

*Counsel for the Office of the Governor of Kentucky*

**AARON M. FREY**
Attorney General of Maine

By: */s/ Paul Suitter*
Paul Suitter
*Assistant Attorney General*
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800
paul.suitter@maine.gov

*Counsel for the State of Maine*

**ANTHONY G. BROWN**
Attorney General of
Maryland

By: */s/ Steven J. Goldstein*
Julia Doyle
*Solicitor General*
Steven J. Goldstein
*Assistant Attorney General*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6414
sgoldstein@oag.state.md.us

*Counsel for the State of Maryland*

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Neil Giovanatti*
Neil Giovanatti
*Assistant Attorney General*
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
giovanattin@michigan.gov

*Counsel for the People of the State of Michigan*

**KEITH ELLISON**
Attorney General of Minnesota

By: */s/ Joseph R. Richie*
Joseph R. Richie
*Special Counsel*
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
(651) 300-0921
joseph.richie@ag.state.mn.us

*Counsel for the State of Minnesota*

**RAÚL TORREZ**
Attorney General of New Mexico

By: */s/ Anjana Samant*
Anjana Samant
*Director of Impact Litigation*
408 Galisteo Street
Sante Fe, NM 87501
(505) 490-4332
asamant@nmdoj.gov

*Counsel for the State of New Mexico*

**AARON D. FORD**
Attorney General of Nevada

By: */s/ K. Brunetti Ireland*
K. Brunetti Ireland
*Chief of Special Litigation*
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

*Counsel for the State of Nevada*

**DAN RAYFIELD**
ATTORNEY GENERAL OF OREGON

By: */s/ Robert A. Koch*
Robert A. Koch
*Attorney-in-Charge, Civil & Administrative Appeals*
1162 Court Street NE
Salem, OR 97301
(971) 673-1880
robert.a.koch@doj.oregon.gov

*Counsel for the State of Oregon*

**JOSH SHAPIRO**
IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE COMMONWEALTH OF PENNSYLVANIA

By: */s/ Jacob B. Boyer*
Jacob B. Boyer
*Deputy General Counsel*
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 460-6786
jacobboyer@pa.gov

*Counsel for Governor Josh Shapiro*

**PETER F. NERONHA**
ATTORNEY GENERAL OF RHODE ISLAND

By: */s/ Leonard Giarrano IV*
Leonard Giarrano IV
*Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400 Ext. 2062
lgiarrano@riag.ri.gov

*Counsel for the State of Rhode Island*

**CHARITY R. CLARK**
ATTORNEY GENERAL OF VERMONT

By: */s/ Jonathan T. Rose*
Jonathan T. Rose
*Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-3171
jonathan.rose@vermont.gov

*Counsel for the State of Vermont*

**JOSHUA L. KAUL**
Attorney General of
Wisconsin

By: */s/ Colin T. Roth*
Colin T. Roth
*Assistant Attorney General*
P.O. Box 7857
Madison, WI 53707-7857
(608) 266-7636
rothct1@doj.state.wi.us

*Counsel for the State of Wisconsin*

* *Application for admission pending or forthcoming*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), I certify that:

1. This document complies with the type-volume limitations of Fed. R. App. P. 27(d)(2)(A) because, excluding parts of the document exempted by Fed. R. App. P. 32(f), the brief contains 5,147 words and thus does not exceed the 5,200-word limit.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using the Microsoft Word word-processing system in Century Schoolbook that is at least 14 points.

/s/ *Bassam F. Gergi*
Bassam F. Gergi
Deputy Attorney General
Office of the N.J. Attorney General

Dated: November 9, 2026

## CERTIFICATE OF SERVICE

I certify that on November 9, 2026, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. Participants in this case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ *Bassam F. Gergi*
Bassam F. Gergi
Deputy Attorney General
Office of the N.J. Attorney General

# ADDENDUM

# TABLE OF CONTENTS

Memorandum & Order Denying Stay
(Nov. 3, 2026) (Dkt. No. 153) ............................................................PA001

Declaration of Katherine B. Dirks
(Oct. 29, 2026) (Dkt. No.151) ............................................................PA009

Transcript of Motion Hearing May 6, 2026
(May 14, 2026) (Dkt. No. 117) ............................................................PA012

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| STATE OF NEW JERSEY, et al., | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Action No. 1:25-cv-11816-IT |
| | * | |
| UNITED STATES OFFICE OF MANAGEMENT AND BUDGET, et al., | * | |
| | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM & ORDER

November 3, 2026

TALWANI, D.J.

Before the court is Defendants' Motion for a Stay Pending Appeal and Administrative Stay [Doc. No. 145] ("Motion").

Plaintiffs—twenty states,[1] three governors,[2] and the District of Columbia—brought this action against Defendants,[3] seeking, *inter alia*, declaratory relief under the Declaratory Judgment

[1] The twenty states are: New Jersey, Massachusetts, New York, Arizona, California, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Mexico, Oregon, Rhode Island, Vermont, and Wisconsin.

[2] The three governors bringing suit in their official capacity are Governor Josh Shapiro of Pennsylvania, Governor Laura Kelly of Kansas, and Governor Andy Beshear of Kentucky.

[3] Defendants are (with substitutions in accordance with Fed. R. Civ. P. 25(d)) U.S. Office of Management and Budget ("OMB"); Russell Vought, in his official capacity as Director of the OMB; the U.S. Department of Agriculture ("USDA"); Brooke Rollins, in her official capacity as Secretary of USDA; the U.S. Department of Commerce; Howard Lutnick, in his official capacity as Secretary of Commerce; the U.S. Department of Defense; Pete Hegseth, in his official capacity as Secretary of Defense; the U.S. Department of Homeland Security; Markwayne Mullin (substituted for Kristi Noem), in his capacity as Secretary of Homeland Security; the U.S. Department of Justice; Todd Blanche (substituted for Pamela Bondi), in his official capacity as Attorney General; the U.S. Department of Labor; Keith E. Sonderling (substituted for Lori Chavez-DeRemer), in his official capacity as Secretary of Labor; the U.S. Department of State; Marco Rubio, in his official capacity as Secretary of State; the U.S. Environmental Protection Agency ("EPA"); Lee Zeldin, in his official capacity as Administrator of the EPA; the U.S. Federal Emergency Management Agency ("FEMA"); Cameron Hamilton (substituted for David

Act and the Administrative Procedure Act ("APA") to clarify the meaning of 2 C.F.R. § 200.340's "Termination Clause"[4] and, by extension, the rights and obligations of the parties subject to the grant agreements at issue in this case. Am. Compl., Count I: Declaratory Judgment, ¶¶ 278–295 [Doc. No. 64]; see also id., Prayer for Relief, 82.

On July 17, 2026, the court denied Defendants' Motion to Dismiss [Doc. No. 88] and granted Plaintiffs' Motion for Summary Judgment [Doc. No. 65] on Count I, Plaintiffs' claim for declaratory relief, declaring that "2 C.F.R. § 200.340(a)(4) (2024) and 2 C.F.R. § 200.340(a)(2) (2021) do not allow terminations of awards based on new program goals or agency priorities that an agency identifies after granting the award." Mem. & Order 32 [Doc. No. 122].

On October 7, 2026, on the parties' Joint Motion for Final Judgment as to Count I Pursuant to Rule 54(b) [Doc. No. 140], the court entered a Rule 54(b) Final Judgment as to Count I [Doc. No. 142], declaring that: (1) Plaintiffs are entitled to declaratory relief; and (2) "2 C.F.R. § 200.340(a)(4) (2024) and 2 C.F.R. § 200.340(a)(2) (2021) do not allow terminations of awards based on new program goals or agency priorities that an agency identifies after granting the award." Id. at 1–2.[5]

---

Richardson), in his official capacity as Senior Official Performing the Duties of FEMA Administrator; the National Endowment for the Humanities; Michael McDonald, in his official capacity as Chairman of the National Endowment for the Humanities; the National Science Foundation ("NSF"); Brian Stone, in his official capacity as Chief of Staff performing the Duties of NSF Director; the U.S. Department of the Interior; and Doug Burgum, in his official capacity as Secretary of the Interior.

[4] The term "Termination Clause" as used herein refers both to 2 C.F.R. § 200.340 (as promulgated in 2020 and amended in 2024) and to the Defendant Agencies' parallel regulations. As modified in 2024, the Termination Clause states that a "Federal award may be terminated in part or its entirety . . . [b]y the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4) (emphasis added).

[5] Plaintiffs promptly dismissed their remaining causes of action without prejudice. Notice of Voluntary Dismissal [Doc. No. 143].

Defendants appealed, see Notice of Appeal [Doc. No. 144], and have moved for a stay pending appeal of the court's judgment, Mot. [Doc. No. 145]. Defendants also seek "an administrative stay pending consideration of this motion." Id.

For the following reasons, Defendants' Motion [Doc. No. 145] is DENIED.

## I. Standard of Review

"[A]s part of its traditional equipment for the administration of justice, a federal court can stay the enforcement of a judgment pending the outcome of an appeal." Nken v. Holder, 556 U.S. 418, 421 (2009) (quoting Scripps-Howard Radio, Inc. v. FCC, 316 U.S 4, 9–10 (1942)). But "[a] stay is an 'intrusion into the ordinary processes of administration and judicial review …and accordingly 'is not a matter of right, even if irreparable injury might otherwise result to the appellant[.]'" Id. at 427 (citations omitted). The stay applicants "bear the burden of demonstrating that they are entitled to the 'extraordinary' relief that they seek." Rhode Island v. Trump, 155 F.4th 35, 41 (1st Cir. 2025) (quoting Somerville Pub. Schs. v. McMahon, 139 F.4th 63, 68 (1st Cir. 2025)).

In determining whether to grant a stay, courts consider the following factors: (1) whether the stay applicants have made a strong showing that they are likely to succeed on the merits on appeal; (2) whether the stay applicants will be irreparably injured absent a stay; (3) whether the issuance of a stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. Nken, 556 U.S. at 426 (2009). Likelihood of success and irreparable injury are "the most critical" factors. Id. at 434. "It is not enough that the [movant's] chance of success on the merits be better than negligible." Id. (internal quotations and citation omitted). Similarly, "simply showing some possibility of irreparable injury fails to satisfy the second factor." Id. at 434–35 (internal quotations and citation omitted). Courts assess the harm to

other interested parties and weigh the public interest "[o]nce an applicant satisfies the first two factors[.]" Id. at 435.

## II. Discussion

### A. *Merits*

Defendants fail to make the "strong showing" that they are "likely to succeed on the merits," Nken, 556 U.S. at 426 (internal quotation and citation omitted), for the reasons set forth in the July 17, 2026 Memorandum and Order [Doc. No. 122], see id. at 8–32.

### B. *Irreparable Injury*

Defendants insist that they face "imminent irreparable harm" because the court's judgment impedes their ability to terminate grants that no longer advance the priorities of the "current Administration." Mem. ISO Mot. 12 [Doc. No. 146]. They further contend that the judgment "interferes with the Executive Branch's authority and ability to decide how to allocate federal funds," "inflict[ing] a severe separation-of-powers harm on the Executive Branch[.]" Id.

Crucially, the court only ordered limited declaratory relief, nothing more. Final J. as to Count I [Doc. No. 142]. The court's judgment does not enjoin Defendants from terminating grants for any lawful reasons, including terminating grants that fail to meet the program goals set forth when such grants were awarded. Final J. as to Count I [Doc. No. 142]. The judgment does not vacate the termination of grants that have already been terminated. See Mem. & Order 19 n.9 [Doc. No. 122] (noting Count II, "[i]n contrast" to Count I, "asks the court to . . . vacate any decision by Defendants interpreting the Termination Clause in this manner"). The judgment does not "enforce a contractual obligation to pay money." Dep't of Educ. v. California, 604 U.S. 650, 651 (2025) (internal quotation and citation omitted); Nat'l Insts. of Health v. American Pub. Health Ass'n, 606 U.S. __, 145 S. Ct. 2658, 2660 (2025) (internal quotation and citation

omitted). And it does not interfere with Defendants' ability to set new program goals and priorities for any new grants awarded.

Defendants argue that the executive branch will effectively have to continue to fund awards that do not match their new priorities and thereby lose "money that the government may never recover[.]" Mem. ISO Mot. 12 [Doc. No. 146] (emphasis added). But without offering any specifics as to what grants they want to terminate, such a representation is too "speculative" a statement to establish they "will be irreparably injured absent a stay[.]" New York v. Trump, 133 F.4th 51, 72 (1st Cir. 2025) (citation modified) (emphasis in original); see also Nken, 556 U.S. at 434–35 ("[S]imply showing some possibility of irreparable injury . . . fails to satisfy the second factor.") (citation modified).

C. *Substantial Injury to Plaintiffs*

The record before the court has repeatedly shown that "there is a substantial risk" Defendants would terminate grants absent declaratory relief. See Mem. & Order 9–10 [Doc. No. 122]. Defendants' contention that they face "imminent" irreparable harm if they are impeded from terminating grants that do not effectuate new priorities, Mem. ISO Mot. 12 [Doc. No. 146], underscores that the ongoing termination of grants is exactly what is at stake. Now that the merits have been determined by this court, Defendants offer little to show that Plaintiffs will not be substantially injured by a stay. Instead, they try to insist that Plaintiffs do not "have a cognizable interest in receiving federal funds to which they are not legally entitled[,]" that Plaintiffs could still "bring suit challenging that termination and seeking damages in the Court of Federal Claims[,]" and that "Plaintiffs . . . would suffer no comparable injury from a stay." Id. at 13. The very terms of these arguments point to their underlying weakness: a stay would injure Plaintiffs by allowing Defendants to terminate their grants unlawfully, have their current claims

mooted, and then be forced to seek relief elsewhere, see Nat'l Inst. of Health, 145 S. Ct. at 2661 (Barrett, J., concurring) (finding, preliminarily, that while challenges to the government's internal guidance belong in district court, challenges to the grant terminations once they have occurred belong in the Court of Federal Claims); and where Defendants' only "injury" is to abstain from conduct this court has found unlawful, it is the Defendants, not the Plaintiffs, that will suffer no comparable injury from a stay.

The court notes further that Federal Rule of Civil Procedure 57 specifically allows a court to "order a speedy hearing of a declaratory-judgment action." A stay would deprive Plaintiffs of the benefit of a declaratory judgment action, which is to "clarify legal rights and obligations before [parties] act[] upon them." Ernst & Young v. Depositors Economic Protection Corp., 443 F.3d 530, 534 (1st Cir. 1995); see also Mendez-Soto v. Rodriguez, 448 F.3d 12, 15 (1st Cir. 2006) ("A principal reason for deciding a case where compensation and coercive remedies . . . have no role is to provide guidance for the future.") (citing Step-Saver Data Sys., Inc. v. Wyse Tech., 912 F.2d 643, 649 (3d Cir. 1990) ("The idea behind the [Declaratory Judgment] Act was to clarify legal relationships so that plaintiffs (and possibly defendants) could make responsible decisions about the future."))).

D. *Public Interest and Other*

Where Defendants fail to establish one factor, and then "rely entirely" on the "same contentions . . . to satisfy the fourth Nken factor[, i.e.,] whether a stay would be in the public interest . . . [,] they have failed to satisfy their burden as to [the fourth] factor as well." New York, 133 F.4th at 73. Because Defendants effectively only argue that the public interest favors a stay by reference to their arguments to other factors, Mem. ISO Mot. 12 (citing Nken, 556 U.S. at 435, for the proposition that "the balance of the equities" and the "public interest" "merge in

cases involving the government”), the court finds Defendants have failed to establish the public interest weighs in favor of a stay.

As to other equitable considerations, the public interest is served by an orderly functioning of the government, including the requirement that Defendants respect the terms of grants that have been issued. The termination of awarded grants based on new priorities impacts the communities, scientific knowledge, and other beneficiaries of such grants; the individuals, communities, and institutions who were to be paid directly under such grants; and the vendors, landlords, and others with whom contracts have been entered to implement such grants. As such, a stay is contrary to the public interest.

The public interest is also served by a judiciary that has the authority to address the cases and controversies before it on the merits and in a timely manner. This court’s decision will certainly not be the final word as to the merits of the dispute. Judgment was entered, albeit after some delay,[6] and an appeal has been filed. If Defendants have confidence that this court is wrong on the merits, Defendants could advance resolution of the dispute on the merits by seeking expedited review. Defendants, however, opt for the stay request, which seeks to avoid that merit-based determination. This tactic—focused primarily on moving targets of justiciability, loaded weighting of the equities, and otherwise avoiding a final resolution of the merits of the dispute—is aimed at allowing the government alone to continue engaging in conduct found unlawful by a lower court while litigation continues. But a special rule for stays for the government is not in the

---

[6] The record suggests that Defendants were responsible for the delay after the court issued its Memorandum and Decision [Doc. No. 122] on July 17, 2026. Per Plaintiffs’ Declaration [Doc. No. 151], Defendants originally offered to draft a request for entry of a partial final judgment on August 12, 2026, Dirks Decl. ¶ 7; advised Plaintiffs two weeks later that they should instead create the first draft, id. ¶ 8; and then, upon receiving Plaintiffs’ draft on September 10, 2026, id. ¶ 9, only returned proposed changes to Plaintiffs on October 1, 2026, id. ¶ 10.

public interest where it threatens respect for and confidence in the judiciary, which has sworn to "administer justice without respect to person[,]" 28 U.S.C. § 453.

E. *Entitlement to Relief*

Defendants have not shown they are likely to succeed on the merits. They have not made a specific or convincing showing of irreparable harm, adequately established Plaintiffs will not be injured, or effectively argued that a stay will be in the public interest. The court thus finds that Defendants fail to meet their burden to show circumstances that justify a stay. See Nken, 556 U.S. at 426.

The court reiterates that a stay "is not a matter of right," Virginian Ry. Co. v. United States, 272 U.S. 658, 672 (1926). It is "extraordinary relief[.]" Rhode Island, 155 F.4th at 47 (quoting New Jersey v. Trump, 131 F.4th 27, 34 (1st Cir. 2025). It represents an exceptional "intrusion" into normal judicial review, New York, 133 F.4th at 65 (citation modified). And it would be an unusual tool for a court to use against its own final judgment, which "creates a strong presumption of its own correctness," Virginian Ry. Co., 272 U.S. at 676.

## III. Conclusion

For the foregoing reasons, Defendants' Motion [Doc. No. 145] is DENIED to the extent that it seeks a stay pending appeal and is DENIED as moot to the extent that it seeks an administrative stay while this motion was pending.

IT IS SO ORDERED.

November 3, 2026

/s/ Indira Talwani
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF NEW JERSEY, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. OFFICE OF MANAGEMENT AND BUDGET, *et al.*,<br><br>Defendants. | Civil Action No. 25-11816-IT |

**<u>DECLARATION OF KATHERINE B. DIRKS</u>**

I, Katherine B. Dirks, an attorney admitted to practice before this Court, do hereby state the following under the penalty of perjury, pursuant to 28 U.S.C. § 1746:

1. I am Chief State Trial Counsel in the Office of the Attorney General for the Commonwealth of Massachusetts, and I appear on behalf of the Commonwealth of Massachusetts in this action.

2. I submit this declaration in support of Plaintiff States' Opposition to Defendants' Motion to Stay Pending Appeal.

3. The facts set forth herein are based upon my personal knowledge or a review of files in my possession.

4. On July 22, 2026, I received an email from Stephen M. Pezzi, Chief Litigation Counsel in the Federal Programs Branch of the Civil Division of the U.S. Department of Justice and counsel for Defendants in this matter, stating: "As you know, Footnote 5 of the Court's recent opinion in the above-captioned matter provided that 'Plaintiffs shall promptly advise the court whether they continue to seek relief under Count II and Count III.' Defendants are also

very interested in that information, as it will inform next steps in this litigation. Have you reached a decision on this?"

5. In a subsequent email on July 23, 2026, Attorney Pezzi expressed "concern with [an] approach … that … would not result in a final judgment that the United States could appeal."

6. In a subsequent email on August 7, 2026, Attorney Pezzi confirmed that the parties had an agreement in principle to "make a joint request for … entry of a partial final judgment on Count I under Rule 54(b)."

7. In a subsequent email on August 12, 2026, Attorney Pezzi agreed to draft a joint motion under Fed. R. Civ. P. 54(b) to seek entry of partial final judgment as to Count I.

8. In a subsequent email on August 26, 2026, Attorney Pezzi requested that Plaintiffs instead "take a first crack at a draft of a joint 54(b) motion."

9. On September 10, 2026, New Jersey Deputy Solicitor General Stephen Ehrlich sent an email to me, Attorney Pezzi, and other counsel, attaching a draft Rule 54(b) motion, as Attorney Pezzi had requested.

10. On October 1, 2026, I received an email from Attorney Pezzi with "a version of the 54(b) motion and proposed order showing our proposed changes in redline."

Dated: October 29, 2026
Boston, Massachusetts

*/s/ Katherine B. Dirks*
Katherine B. Dirks
Chief State Trial Counsel
Office of the Attorney General of Massachusetts

**<u>CERTIFICATE OF SERVICE</u>**

I, Charles C. Kelsh, certify that counsel for or on behalf of plaintiffs have submitted the foregoing document with the clerk of court for the District of Massachusetts, using the electronic case filing system of the Court. Counsel for Plaintiffs hereby certify that they have served all parties electronically or by another manner authorized by Fed. R. Civ. P. 5(b)(2).

/s/ *Charles C. Kelsh*
Charles C. Kelsh
State Trial Counsel

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

STATE OF NEW JERSEY, et al.,

Plaintiffs,

v.

U.S. OFFICE OF MANAGEMENT AND BUDGET, et al.,

Defendants.

Civil Action No. 1:25-cv-11816-IT

BEFORE THE HONORABLE INDIRA TALWANI, DISTRICT JUDGE

MOTION HEARING

Wednesday, May 6, 2026
1:06 p.m.

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts

Robert W. Paschal, RMR, CRR
Official Court Reporter
rwp.reporter@gmail.com

**A P P E A R A N C E S**

On behalf of the Plaintiffs:

NEW JERSEY ATTORNEY GENERAL'S OFFICE
BY: STEPHEN EHRLICH
BASSAM GERGI
PO Box 112
Trenton, NJ 08625
(609) 984-3900
stephen.ehrlich@njoag.gov
bassam.gergi@njoag.gov

OFFICE OF THE ATTORNEY GENERAL
BY: ANNA E. LUMELSKY
VANESSA AZNIV ARSLANIAN
One Ashburton Place
Boston, MA 02108
(617) 963-2334
anna.lumelsky@mass.gov
vanessa.arslanian@mass.gov

On behalf of the Defendants:

UNITED STATES DEPARTMENT OF JUSTICE
BY: STEPHEN MICHAEL PEZZI
1100 L Street NW
Washington, DC 20005
(202) 305-8576
stephen.pezzi@usdoj.gov

**P R O C E E D I N G S**

(In open court at 1:06 p.m.)

THE DEPUTY CLERK: United States District Court is now in session, the Honorable Judge Indira Talwani presiding.

This is Case Number 25-cv-11816, State of New Jersey, et al. v. US Office of Management and Budget, et al. Will counsel please identify themselves for the record.

MR. EHRLICH: Good afternoon, Your Honor. Stephen Ehrlich from the New Jersey Attorney General's Office on behalf of plaintiffs; and with me, also from the New Jersey Attorney General's Office, is Bassam Gergi.

THE COURT: Good afternoon.

MS. LUMELSKY: Good afternoon. Anna Lumelsky from the Massachusetts Attorney General's Office for plaintiff states; and with me is Vanessa Arslanian, also from the Massachusetts Attorney General's Office.

THE COURT: Good afternoon.

MR. PEZZI: Good afternoon, Your Honor. Stephen Pezzi from the Department of Justice on behalf of the United States.

THE COURT: Good afternoon.

So I have the plaintiffs' motion for summary judgment on Count 1, and I have the defendants' motion to dismiss. And I wanted to start out by making sure I

understand the posture of this litigation.

As I read the complaint, the plaintiffs are asking for relief on Count 1 and, in the alternative, if Count 1 is not granted, then Counts 2 and 3; is that correct?

MR. EHRLICH: That's correct, Your Honor.

THE COURT: Okay. I'm going to go back and forth for a few minutes, so before you take over the podium, I'm just trying to get the shape of this.

MR. EHRLICH: Okay. Understood.

THE COURT: So -- and you moved for summary judgment on Count 1 and not on the other counts. And in your view, if I were to grant your motion, what happens to Counts 2 and 3?

MR. EHRLICH: I think if you grant our motion, we -- you can enter judgment on Count 1, and we can reserve on Count 2 and 3. I don't think you have to rule on those. You just enter judgment for the plaintiffs, Your Honor.

THE COURT: Well, I can't enter judgment if you have things open.

MR. EHRLICH: Well, I mean, you can -- we can sort of hold those and perhaps --

THE COURT: But I can't enter judgment.

MR. EHRLICH: Well, so I guess we can -- we can confer with the other side about exactly what that looks like. Perhaps we'll just proceed to final judgment because,

I mean, the other two are only in the alternative anyway. So I think if Your Honor enters --

THE COURT: That's my question. Those are the alternative? Okay.

MR. EHRLICH: Yes. If you -- sorry to be clear, if you enter judgment on Count 1, we get all of the relief that we are seeking.

THE COURT: And Counts 2 and 3 I don't have to spend time on?

MR. EHRLICH: Correct.

THE COURT: Okay. For defendant, you're moving to dismiss all of the counts, but you have slightly different arguments on the different counts, correct?

MR. PEZZI: Yes, Your Honor, that's correct.

THE COURT: So what I would like to at least start off with, and maybe we revert later to something else, but what I would like to start off with is Count 1.

And I will start with their motion to dismiss, because at least as to the justiciability issues, if you're not properly here, we can't get there. But I'd like to have you reserve -- right now, just focus -- instead of all counts, if you could focus your argument on Count 1.

And it's my practice to go back and forth, but that's your motion to dismiss, so I'll allow you to start. We'll go back and forth. And then once I understand the

arguments on the justiciability, then I will hear the motion for summary judgment, essentially, on the merits of Count 1; and then depending on our time, we'll see whether we get to two or three. Okay?

So with that, I'll let you start, and I'll probably interrupt you.

MR. PEZZI: Okay. Thank you, Your Honor. Stephen Pezzi from the Department of Justice.

I -- the first thing I would say is I think all of our arguments, other than the waiver and forfeiture argument about failure to participate in the comment process, apply to all three counts of plaintiffs' complaint. So I -- for purposes of the current discussion, respecting Your Honor's directions, we'll not get into the waiver and forfeiture issue, which is not at issue for Count 1.

The remainder of our arguments, I think, do apply to Count 1. We have a series of threshold and justiciability arguments; and then, of course, I'm happy to address the merits. Starting --

THE COURT: And let me just make sure we're all on the same page, because I think we are, but there's a fair bit of ink back and forth. I understand this action to concern only grants that have not yet been terminated, maybe that haven't even been awarded, but certainly we're not addressing grants that have been terminated, correct?

MR. EHRLICH: That's correct, Your Honor.

THE COURT: Okay. So we're in the world of grants that have been awarded but not terminated and maybe grants that might be awarded in the future. But it seems sort of the -- we might as well start with the grants that have been awarded that the plaintiffs are concerned may be terminated.

MR. PEZZI: Yes, Your Honor. And so to start with that, those categories of grants, I think the first argument we raise is a standing argument. And I think the best way to think about that standing argument is about there being, in the government's view, a mismatch between the injury in fact that plaintiffs have identified and the target of this lawsuit, including in Count 1.

So the government, perhaps, unsurprisingly does not dispute that the termination of a grant, whether it's the past termination of a grant or the imminent future termination of a grant, would itself give rise to a concrete Article III injury.

THE COURT: So "imminent future" meaning they've announced that the grant is going to be terminated? What do you mean by that word?

MR. PEZZI: For plaintiffs to carry their burden to show standing, they need to show either an actual injury or an imminent future injury. And so if we're just talking about possible future grant terminations rather than the past

grant terminations --

THE COURT: What about the cases that allow in various contexts consideration of sort of preenforcement questions? Are you saying that those are -- they just don't have standing to raise any preenforcement question?

MR. PEZZI: No, Your Honor. We are not making some sort of, you know, broad attack on the concept of a preenforcement challenge. Preenforcement challenges can and do happen. But in a preenforcement challenge, the plaintiff may often have a harder time, as we think the plaintiffs do here, showing an actual and imminent future injury.

And so our arguments are based on -- I mean, there's -- the causation issue is about the mismatch between the injury and the target of the lawsuit. And so even if we're only talking about possible future grant terminations, the cognizable Article III injury that would give plaintiffs standing to challenge those possible future grant terminations is the termination of that grant.

And we do not dispute --

THE COURT: And is it your view that the threat, the cloud of termination isn't sufficient?

MR. PEZZI: We do not think that, you know, the cloud of termination is sufficient. It's not even clear to me the extent to which plaintiffs seek to rely on that cloud rather than pointing to actual grant terminations, both past

and future.

But even interpreting their complaint that way, I do not think the uncertainty over the possibility of potential future grant terminations is a sufficiently concrete and particularized Article III injury to support standing.

I think the ripeness question --

THE COURT: Before we get to ripeness, let's --

I'm going to bat it back to you on standing: Why do you think you can challenge this regulation where, as to the grants at issue here, which are the ones -- for purposes of this question, let's just say the ones that have been awarded, but nobody is saying it's going to be terminated. Why do you have standing to ask me to interpret whether it could be terminated?

MR. EHRLICH: So I think our theory of standing, Your Honor, is very straightforward. It's we need to show a substantial risk that they're going to be terminated using the clause, and we have that in spades here.

So, first, you have the history of past terminations. There have been hundreds of terminations worth billions of dollars. You have two presidential executive orders directing those terminations to continue. And you have the terminations, indeed, continuing, including through the course of this litigation as recently as just last --

just two months ago in March. DOJ canceled two grants using the clause to the State of Massachusetts.

And then as Your Honor identified, we have both current and future anticipated grants. I know you're focusing on the current one. So I think, under those circumstances, we have shown a substantial risk. I think this goes far beyond the First Circuit case law in this area.

So, usually, one past injury plus a continuing policy or practice is enough. I would point Your Honor to the *Drewniak* case --

THE COURT: So the --

MR. EHRLICH: Oh, sure.

THE COURT: -- continuing policy and practice, you're -- what are you looking -- what are you relying on when you say there's a policy and practice?

MR. EHRLICH: Well, their -- their use of the clause, to terminate grants based on newly identified agency priorities, is their practice. They've done it --

THE COURT: Okay.

MR. EHRLICH: -- hundreds of times.

THE COURT: So what's the policy?

MR. EHRLICH: The policy is -- maybe just the practice is more what I was focused on, was the practice of terminating these grants using the clause. And I think that goes, as I was saying, far beyond what the case law holds.

So you have the *Drewniak* case out of District of New Hampshire. There was prospective relief sought. It was about traffic checkpoints. It's not super important. But there was one traffic checkpoint in the past. They said there was a future policy, even though the defendants said, you know, it's not going to -- "We don't have any plans for it," and the Court found standing.

The First Circuit in *Webb*, which was a data breach case, they said one instance of misuse of the data from the data breach was enough to show standing. And so I think it goes far beyond that.

I think not for nothing, but they haven't disavowed using the clause. As I --

THE COURT: I understand --

MR. EHRLICH: Yeah.

THE COURT: I understand that. They're not --

MR. EHRLICH: They're not saying they're not --

THE COURT: -- one way or another. But you have the burden of showing that there's -- there's this whatever level of imminence of this risk.

MR. EHRLICH: No, absolutely we do, and I think we've done that in spades here. We have 57 unrebutted declarations showing past -- past enforcement, showing their practice of terminating using the clause.

You know, the First Circuit in the *PILF v. Bellows*

case found standing even when the enforcer in that case, the state AG, had disclaimed that they were going to enforce it, and the First Circuit still found standing.

So I think we have plenty to show that the past practice coupled with the presidential executive orders, you know, directing terminations, including terminations throughout the litigation as recently as March, and plus the current and future grants that we have, you know, are plenty.

We have over 1,100 current grants -- and I know Your Honor asked specifically about the current grants -- over 1,100 current grants worth over $5 billion that are at risk today if the agencies decide to change their priorities and terminate them. So we think that's plenty here, Your Honor.

And the last point I'll just make on this is, in the challenges we've seen, especially in the "post-*NIH*, Justice Barrett concurrence" world where people challenge these broad agency policies about grant terminations, we're not aware of a single case holding that there's no standing there. I mean, most of those cases don't even discuss it.

For example, the *Massachusetts v. NIH* case from the First Circuit didn't even discuss it. Obviously, Your Honor found standing on that -- on that theory in the Massachusetts -- in the *American Association of Universities* case. And I would point also to the *Washington v. FEMA* case

that Judge Stearns decided.

So we're not aware of any case that has not found standing based on a future injury for a loss of funds because of grant terminations.

THE COURT: You can respond to that or you can move to ripeness, whichever you want to do. They're somewhat related.

MR. PEZZI: Certainly, Your Honor. Maybe I'll try both.

I mean, in direct response, I think a lot of those arguments would be good arguments that there's a substantial risk of future injury from the termination of a grant. And if this were a lawsuit challenging the termination of a grant or a preenforcement challenge about the termination to a grant, then I think a lot of our arguments would look very different.

This is not a challenge to the termination of any grant, past or future. The plaintiffs have explicitly disavowed that theory, presumably for the very sound, strategic reason that we would have a whole host of other arguments, for example, about why those lawsuits need to be brought --

THE COURT: Well, but Justice Barrett did carve out this area that something is going to be going forward in the District Court, right? So you quote the part that says

everything goes into the Tucker claim part. But she -- the majority, the -- you know, it's one vote, but we have the notion that there is something here.

MR. PEZZI: That's fair, Your Honor. I would say a few things about that. One is -- I mean, the -- actually, the last paragraph of Justice Barrett's concurrence I think raises a real question and says explicitly, you know, we're not deciding today whether there might be other justiciability issues, and she specifically mentions final action agency action.

THE COURT: Correct. And we can talk about whether there's final agency action, but that's a different one. She doesn't say there's a standing problem here. She says these things are appropriate to be in the District Court.

MR. PEZZI: That's certainly a correct assessment of Justice Barrett's opinion. We don't dispute that. I will just, before I move on to ripeness, just make clear that we do not dispute that if someone's grant is terminated, they have Article III standing to terminate that grant, not --

THE COURT: But if they have -- if the grant is terminated, they can't be here. But there's a universe where they can be here, and that's -- I mean, I'm -- as the Supreme Court has made very clear, I need to follow the Supreme Court. And the Supreme Court has said there is something that can be here, right?

So this isn't the world of when they've been terminated. It cannot be the case -- the -- *NIH* case would have come out differently if the rule is that you can't do anything until the grant has been terminated, because if that was the rule, there would be nothing left to be in front of the district courts.

MR. PEZZI: I think, at that level of generality, I'm not sure I have any disagreement with what Your Honor just said. I'll move on to ripeness --

THE COURT: Yeah.

MR. PEZZI: -- and just explain why I think some of the ripeness principles, I think, counsel in favor of a similar conclusion, although, I think, even more straightforwardly in some respects.

The ripeness question here is more about the lack of a concrete dispute between the parties with respect to any particular application of what my friend on the other side calls a practice.

THE COURT: Well, isn't there a dispute as to whether you can terminate the grants based on failure to meet newly announced priorities rather than failure to meet the priorities that were identified at the time that the grant was issued?

MR. PEZZI: There is certainly a legal disagreement about that question of law between the parties and --

THE COURT: Well, and as a practical matter, what the plaintiffs are saying is that the administration has been using that interpretation of the regulation to cancel the grants that have been canceled. So that's why they think this is a dispute that's a real dispute right now. Why do you disagree?

MR. PEZZI: Because, Your Honor, they are not bringing a lawsuit about the use of that interpretation that the parties do disagree on to actually terminate any particular grant. They are just saying that, "This has happened in the past. We are worried it might happen again in the future."

THE COURT: "And so we want a declaration as to what the regulation means." That's what they're saying.

MR. PEZZI: Yes, Your Honor. And we think the Supreme Court's ripeness jurisprudence makes clear that, although it may be more convenient for, in some respects, the parties and the Court to adjudicate a case like this at that level of generality about the abstract legal principle, the ripeness doctrine generally requires parties to litigate these questions in the context of a concrete application of the --

THE COURT: Well --

MR. PEZZI: -- regulation.

THE COURT: What's -- I understand that, and I

understand the reason for that, which is that, in the abstract, you could end up all different ways. But there's nothing -- is there really any -- other than we don't know the particular grant that might be terminated next, is there anything abstract about this dispute itself?

I mean, the dispute is -- it seems to me, the dispute is: Does the government have the authority to do this, or does the government not have the authority to do this? And the "this" is clear. It's not like, well, we don't know what they're going to do in any one case. It's -- the "this" is saying you can use -- measure against new priorities instead of the priorities that were there when the grant was issued.

MR. PEZZI: Again, Your Honor, I -- I don't really dispute that the parties have a clear legal disagreement on the question of what is the best interpretation of this regulation, at least on the narrow question of whether or not old agency priorities rather than new agency priorities can be considered by the government in terminating a grant.

We still think the ripeness doctrine requires that that question be litigated in the context of a concrete application rather than in the abstract.

And so to be clear about what I mean about this, we're not saying that no court could ever opine on the -- on that abstract, on that legal question. We just think a Court

needs to opine on that legal question in an actual case or controversy where that legal question is dispositive of whether an actual grant termination is unlawful or lawful.

And so this is the sort of thing that you could imagine a court opining on in the context of a specific dispute over the termination of a specific grant, and there's been plenty of litigation that looks like that over the last year or two. Sometimes the government wins those cases. Sometimes the government loses.

But that is the right way to litigate this question about the interpretation of the regulations, not this sort of abstract question about, you know, in a vacuum, has the government misread its own regulations?

THE COURT: What's your answer on the ripeness question?

MR. EHRLICH: I think Your Honor has it, basically, the -- exactly right. We have a concrete legal dispute. It's a purely legal question about whether the clause can be used to terminate grants based on newly identified agency priorities or those in place at the time of the grant. It's a concrete legal dispute. There's no facts that are going to help us flesh that out in the actual termination proceeding in the Court of Federal Claims. And then -- so I think that's very clear, that there's a concrete dispute.

In terms of the second prong, the First Circuit has

been over and over clear. We cited the *Verizon New England* case as recently as *Jensen* last year. They say for a declaration action, you look at whether this would be using in setting the controversy to rest.

That's exactly what Your Honor's declaratory judgment would do. It would be a preclusive judgment against the defendants that they can't use the clause to terminate based on newly identified agency priorities. That would extremely -- that's extremely helpful to us.

We have a lot of uncertainty based on grants being pulled out from under us. It makes it hard to plan our state budgets. And this is irreversible damage for us. We have programs that would be shut down and things that you can't get recouped on the back end. You could get damages, but you couldn't stop programs being shut down and things like that.

And then the last thing I'll just say, Your Honor, is similar to what I said in standing. In this post-*NIH* world, we're not aware of any court saying that these types of cases are unripe. You know, there's been many decisions in this front; and most of them, again, do not really even discuss ripeness, and the ones that do do find ripeness. So the *Washington v. FEMA* case I'll reference again, a couple of Illinois versus the federal government cases in the District of Rhode Island.

I think the federal government's view that you have

to wait for the concrete proceeding later and litigate these sort of piecemeal is just not right. I mean, that would be true in every preenforcement standing case, and we know that's not right. *New Hampshire Lottery* from the First Circuit speaks to that as well as many other cases and, again, as I mentioned, it hasn't been true in these funding cases post-*NIH*.

So I think, for those reasons, we think there's ripeness here.

THE COURT: Okay. Do you have a further justiciability argument with causation?

MR. PEZZI: We talked about some features, maybe not every little wrinkle of our standing and ripeness arguments. Those are obviously discussed at some length in the papers. I'm happy to address any questions Your Honor has about those. We certainly do have --

THE COURT: I think I just need to go back and -- oh, you did raise a question about declaratory judgment being untethered to anything. But I think you didn't disagree when they said, well, it's tethered to the APA here as the cause of action is asserted.

MR. PEZZI: All I'll say about that, Your Honor, beyond what's in the papers is, I mean, I think that is easily the most technical of our arguments. I mean, we do think the First Circuit case law is clear that the

Declaratory Judgment Act itself does not create a cause of action.

THE COURT: But nobody is disputing that. They're saying the Declaratory Judgment plus APA.

MR. PEZZI: And we agree that if there is a violation of the APA, a declaratory judgment can sometimes be an appropriate remedy; although, just to be clear, they don't seek relief at this time on Count 2 or Count 3, which are their substantive APA counts. But Your Honor is right at a high level.

THE COURT: But they do mention APA in the complaint under Count 1.

MR. PEZZI: They do cite to the declaratory relief provision of the APA, I believe, yes.

THE COURT: Okay. Let's spend a little bit of time talking about the merits of Count 1, and then if we still have a little bit more time, we can come back to any further justiciability issues on Counts 2 and 3.

MR. EHRLICH: Can I just make one -- it was just on the point Your Honor was making right there, which is we think you can do a standalone declaratory judgment. That's what the First Circuit did in *New Hampshire Lottery*, but you don't have to do that. You can just go under the APA for -- and we can discuss that.

I just wanted to be clear, Your Honor. So we have

the argument that you can enter a declaratory judgment alone, but you can also do it through the APA based on final agency action. We would win on either of those.

THE COURT: Okay. I can tell you I'm much more comfortable with it being tied to the APA and being floating out there. You may have one case that says it. There are many cases that say you can't.

MR. EHRLICH: Yeah, I'm happy to move on if Your Honor isn't -- but I would say the cases don't really say that. I think they're confused. I think the cases stand for the proposition that you need federal jurisdiction, which is both a federal question and standing. And when you have that, you can enter declaratory judgment.

That's what the First Circuit did in *New Hampshire Lottery*. Like, if you look at the underlying complaints in *New Hampshire Lottery*, it's just counts of declaratory judgment. That's all they sought. So I think Your Honor can do that here, but we're -- I'm happy to get more into that, but you can just go through the APA, if you're more comfortable that way.

THE COURT: Let's -- I am more comfortable that way.

MR. EHRLICH: Okay.

THE COURT: Let's --

MR. PEZZI: Your Honor, just briefly, for purposes

of a clean record, if Your Honor wants to move on to the merits, we're, of course, happy to address the merits. I did just want to make clear, distinct from our standing and ripeness arguments, we do have a separate final agency action argument, which is --

THE COURT: Are you raising that as to Count 1 or Count 3 only?

MR. PEZZI: Count 1 and 2, Your Honor.

THE COURT: Okay.

MR. PEZZI: And so --

THE COURT: All right. So let's talk about that then.

MR. PEZZI: Yes, Your Honor.

THE COURT: And I'll let you start on that.

MR. PEZZI: So, I mean, we think even if plaintiffs were able to carry their burden on standing and ripeness, final agency action is a separate doctrinal test and an independent hurdle that they have to clear that requires two things: that the challenged action marked the consummation of the agency's decision-making process, one; and, two, that the action be one by which rights or obligations have been determined or from which legal consequences may flow.

Again, an actual grant termination, past, present, or future, absolutely satisfies that requirement; but they -- and I think everyone is clear about this -- they are not

challenging any actual past, present, or future grant termination. They are challenging the government's interpretation of its own regulations. And so --

THE COURT: Well, so the way I was understanding their argument is they're saying the final agency action is the reg. Is that wrong?

MR. EHRLICH: No, that's right, Your Honor.

THE COURT: So if the final agency action is the regulation, can they proceed that way?

MR. PEZZI: If they are challenging the regulation itself, for example, arguing that the regulation itself is unlawful or violates the APA or violates some statute, that regulation is going to be final agency action. And in Count 3, that's what they do, and so we don't dispute final agency action on Count 3.

Count 1, though, does not argue that the regulation itself is unlawful. It instead argues that the government has misinterpreted or misread its own regulation. They are saying that, you know, maybe in January of 2025, there was a lawyer at OMB who had a light bulb go off in his head and think, "Okay. Here's how I think we should interpret this regulation."

And, I mean, we're willing -- assuming that that's exactly what happened for purposes of today's argument, that light bulb going off in an OMB lawyer's head, where the

government's abstract interpretation of this regulation is not final agency action, the reason we know that is because that interpretation governs the possible termination of many thousands of grants that have not been terminated.

Because what actually results in the consummation of the government's decision-making process or what results in legal consequences for the grantor or the grantee is the decision to terminate or to not terminate a grant. And if the same grants that have been retained are subject to the same interpretation, I think that shows pretty clearly that the relevant final agency action would be the decision to terminate a grant, not the interpretation of the regs in the abstract.

THE COURT: Well, you're not saying that the grants that haven't been canceled won't be canceled.

MR. PEZZI: We're certainly not disavowing the possibility that future grants might be terminated, including --

THE COURT: Including for this reason.

MR. PEZZI: Correct, Your Honor.

THE COURT: Okay. So let me turn to plaintiff here. What is it that you are claiming is the final agency action?

MR. EHRLICH: So we're --

THE COURT: Count 1.

MR. EHRLICH: We would say -- so I'll say two different theories. One is we think we're challenging the regulation. We use the same of paragraph in both Count 1 and Count 3 that the defendants cite to concede final agency action.

THE COURT: Okay. But just -- instead of telling me what their concession was in the brief, which you already said in your brief, tell me what your -- tell me the theory. Tell me the theory of what's the final agency action.

MR. EHRLICH: The final agency action, there's two ways to look at it. One is, as I think the briefing sort of teed up, the final agency action is the regulation. Everybody agrees that that's final agency action. The relief in Count 1 and Count 3 are both targeted at the regulation.

Count 1 is just narrower relief. We want declaratory judgment, and they get to keep their regulation and use it for the narrow slice of things we say they can use it for. Count 3 is more of the nuclear option. It would just wipe the regulation away altogether. So we think it's targeted at the regulation. We think if you -- and we think we're, obviously, on solid footing since everybody agrees that's final agency action.

If you wanted to say the -- we're challenging the interpretation, we think we're more than fine there too. It's not -- I mean, if you look at the two prongs, it's not

tentative or interlocutory in looking at the consummation prong. It's very final. We know it's final. They've used it this way hundreds of times.

THE COURT: Do we -- do you have any examples where you point to -- where -- anyone, a plaintiff, points to something as a final agency action where they don't have a piece of paper that they're pointing to?

MR. EHRLICH: Absolutely, Your Honor. It happens all the time. I can point you to -- Judge Saris said this in the *Presidents' Alliance* case from March. Judge Young said this in the *American Association of University Professors* last year, that it does not have to be in writing. That would incentivize agencies to simply not put things in writing to evade judicial review.

And I'll give you two examples of where this has happened. The -- Judge Stearns' decision in *Washington v. FEMA* talked about -- it was a termination, a possible termination of BRIC grants from FEMA. And, you know, they had put out some press statements. There was no definitive piece of paper. And Judge Stearns said, sub silentio or not, there was final agency action.

And then just one more example, Your Honor, the *Illinois v. Vought* case out of the Northern District of Illinois. They said the case for final agency action was entirely circumstantial, quote/unquote, and then marched

through the sort of circumstances. In that case, it was about whether funding would be cut to four specific states and ended up saying there's enough here to determine that there's final agency action.

So it happens all the time. So sometimes --

THE COURT: What exactly is the final agency action?

MR. EHRLICH: Well, under either theory -- so one theory, which is more straightforward, is we're challenging the regulation. So that's the final agency action. Or under their alternative challenge, it would be we're challenging the interpretation of the regulation.

THE COURT: I'm sorry; I didn't frame that question well.

Is the action, in your view, whether it's the interpretation or the reg itself, is the action the idea that they can choose to terminate grants if they don't meet current priorities? Is that the action or -- I mean --

MR. EHRLICH: I think that's --

THE COURT: Give me the words that you think are there sub silentio.

MR. EHRLICH: Yeah, I think what Your Honor is getting at is sort of the point that this is not the last step in the process, that, like, the reg itself or the interpretation are not doing anything. And I guess I would

say two -- two things about that. Obviously, stop me if I'm going down -- this isn't what you meant.

But I would say two things on that. One, I don't think anyone thinks that's true, even the defendants, because the reason they concede final agency action on Count 3, which they interpret as the reg, is they say that it shapes the contours of the legal and contractual relationship with the grantor and the grantee. That's as true for the regulation as it is for the interpretation. Either way, subsequent grant terminations have to happen. So I think, even under their theory, you would have final agency action.

But then, in terms of the case law, I mean, the courts routinely find final agency action even though there's further things to happen. So the Supreme Court in *Hawkes* did this. There was an agency interpretation about the Clean Water Act, and there was no -- not going to be an enforcement action yet, but they said it doesn't matter. It's still final.

The Ninth Circuit has put this even more bluntly. They said even if the ultimate impact of the action rests on some other concurrence that there is a final agency action. And that has been a kind of through line through the -- these type of grant funding, future termination cases, including the *New York v. Administration for Child and Family Services* case.

So I think it's very clear. Your Honor had the *Association of American Universities* case about the -- the indirect cost cap. You didn't have to tackle final agency action there. It wasn't even challenged.

But Judge Burroughs had a similar case where she talked about final agency action, and she says, you know, it's enough that the parties will already or will soon directly -- that agency action would already or soon directly affect the parties. Of course, as we've talked about, that's what we have here. It has changed the landscape to --

THE COURT: But I think --

MR. EHRLICH: Yeah.

THE COURT: -- I mean, at least -- I don't know about the case in front of Judge Burroughs, but the case in front of me, there was sort of a -- it wasn't all happening sub silentio. It was: "Here's what we're going to do. Remember those negotiated overhead rates? Those are no longer in place," and that was an announcement that was going to happen.

But we don't have -- what we have here is we have, in each individual termination, there's the assertion that they can do it; but there isn't a blanket sort of written statement of how you get from "We want to terminate grants" to "We are terminating grants." You don't have a statement that says, "We can do it because we've changed priorities."

MR. EHRLICH: No, I -- I agree, Your Honor. As I said, I don't think it has to be written. You can -- just to back up for one second, you can bypass all this by saying we're challenging the regulation.

But just on the interpretation point, it doesn't have to be written, as I discussed; and I would say it's anything but silent. I mean, they've done this hundreds of times. They are vigorously defending the interpretation here. They haven't disavowed it. They've started incorporating this interpretation into new grants, and the President, in his executive order, has adopted this interpretation. So it's not of tentative or interlocutory nature. It's very much final. It's consummated.

And I think the real action is, is this -- does this have some sort of legal consequences? And we say yes. They can now change their priorities and terminate our grants on a dime; and that's exactly the sort of legal consequences, you know, as the -- as the defendants say in their words, shapes the contours of the relationship between the grantor and the grantee. And I think that's well within the case law.

THE COURT: Anything you want to say on that before we go to the merits? Because I would like to talk about the merits a little bit.

MR. PEZZI: Just very briefly, Your Honor.

The first thing I will say is I think even plaintiffs' description of their various counts today makes clear that Count 1 can't possibly be a challenge to the regulation itself in the way that Count 3 conceivably is.

I think my friend on the other side described Count 3 as the nuclear option to wipe the reg off the books. That's what it means to challenge a reg. That's usually the result of a successful challenge against a reg under the APA.

Count 1 is something else. It's about, notwithstanding this concededly lawful reg, we think it should be interpreted in one way rather than another way. And so I don't think the final agency action question can possibly be answered by saying the reg itself is final agency action because they're not seeking vacatur or an injunction against the reg. They're seeking --

THE COURT: Well, they're seeking that -- they're essentially saying that the reg has to mean this or it's no good, I suppose.

MR. PEZZI: In Count 3, they are making, in the alternative, a request for relief that would operate against the reg, like, that would wipe the reg off the books. And, again --

THE COURT: But they're not -- in Count 1, they're not asking to wipe the reg off the book. They're asking me to interpret the reg in a way that would avoid it being

written off the books.

MR. PEZZI: Yes, Your Honor. And so what they are challenging, therefore, in Count 1 is the idea that an OMB lawyer allegedly had in his office one day to interpret the reg one way or the other.

THE COURT: Well, it is more than that. I mean, I understand that I don't have a piece of paper, and that does trouble me.

On the other hand, he's correct that you haven't denied this interpretation, and all of these grants keep getting eliminated based on this interpretation.

MR. PEZZI: Yes, Your Honor. And I'm glad you brought that up. I mean, to be clear, we are not suggesting that you can avoid judicial review by, you know, refusing to put a new policy down on a piece of paper. I mean, I think I agree with plaintiffs' counsel that it can't be dispositive whether it's, you know, a written policy or an unwritten policy.

Our argument is, instead, that the test for final agency action requires, first of all, the consummation of -- as in the end of the decision-making process.

THE COURT: So would you disagree that there's a policy?

MR. PEZZI: I would -- so I want to be careful about how I answer this. To be clear, I am not aware of

there ever having been, you know, this -- this light bulb moment that I keep returning to in --

THE COURT: Okay.

MR. PEZZI: -- some of my answers that sort of --

THE COURT: So it happened over a few weeks that they figured it out. There wasn't just a single light bulb, and it wasn't a single DOGE employee. It was figured out over a period of time. But is it currently the policy?

MR. PEZZI: I -- again, to be absolutely clear about this, I do not know one way or the other whether any decision was made on one day or over a period of weeks or whether any formal decision was made at all.

What I do know, though -- and we have not disputed -- I mean, plaintiffs are correct that the government interprets this regulation to allow for termination of a grant based on the grant no longer effectuating program goals or agency priorities, and that includes agency priorities that have changed during the grant-making process. Plaintiffs are correct that that is the government's interpretation of that reg.

To be clear, I'm not even sure that that's a new interpretation of the reg. If you asked an OMB lawyer about that two years ago, you might have gotten the same answer. Plaintiffs are certainly correct that that interpretation has been invoked more frequently in the last year and a half or

so than it had ever been invoked before, but --

THE COURT: Well, why don't we go ahead then and let's talk about the merits of it, because if it has been invoked before, then that presumably makes your argument on the merits easier.

But this is your motion, so I'm going to let you go first on this.

MS. LUMELSKY: Yes. Thank you, Your Honor.

The defendants have focused mainly on procedural issues in their briefing, and I -- and that shouldn't distract from the significance of what's at issue here. They're asserting the right to terminate any grant, essentially, at will simply by saying the words "agency priorities." And that is how they have been using this clause. They've been --

THE COURT: Okay. I understand the magnitude of your problem.

MS. LUMELSKY: Right.

THE COURT: But the question here is now: What does this language say or not say?

MS. LUMELSKY: Right. And their interpretation, it's inconsistent with the text of the clause, especially when considered in the context of the full regulatory system and the regulatory history here.

So when -- when OMB introduced this language into

the clause in 2020, it provided an explanation of what the purpose of the clause was that was fully consistent with the plaintiff states' interpretation and entirely inconsistent with what the defendants are arguing that the clause says now.

They did not say in 2020, when they introduced the language or in 2024 when the language was revised in a minor way that terminations were permitted based on newly developed priorities. And one would have assumed they would have said that given how significant that is and as shown to be in -- has created chaos, as we've all seen.

But if you look at when the language was introduced in 2020, what they said as an explanation for why it was added, they said, "The intent of this change is to ensure that federal awarding agencies prioritize ongoing support to federal awards that meet program goals."

And so, specifically, they're talking about ongoing support, and then they -- so meaning support -- continuing to support grants that were meeting priorities and continue to meet priorities. And then they provided two examples to make that very clear.

Both examples talk about additional evidence that reveals that a specific objective is no longer being achieved. Both of them had to do with kind of a mismatch between the award and the original priorities or original

program goals. They didn't say anything about changes in priorities, which -- and those were all the examples that they provided.

You would think that if what they were talking about was terminations based on changed priorities, that they would have at least mentioned that.

And it's also instructive to look at kind of the full set of revisions that were happening in 2020 because there were a number of revisions that they made at the same time. And there was a strong theme throughout those revisions on the concept of ensuring grantee accountability by making sure that they met the objectives that had been developed at the time or before the notice of funding opportunity was announced.

THE COURT: So let me interrupt you here. I know that I'm not -- as a construction rule, I shouldn't worry too much about headings; but I did note that this termination provision is a subsection under -- and I don't have that title in front of me, but it's basically problems on the part of the grantee for -- that would lead to termination. And you end up with they don't comply with their grant, they don't deliver, et cetera, and it's under this.

Is there a different set of -- is there a different place in the reg that underscores -- instead of the obligations of the grantee, is there a different section that

underscores the rights of the grantor? So, for example, if there's no money anymore, is there a provision that says we don't have to fund this anymore? Or, you know, are there some other --

Because this is a -- this is being interpreted as a right of the grantor to change the terms mid-grant, but I see it under a section of the grantee failing to meet the obligations of the grant. But are you familiar enough with the regulatory scheme? Is there a different place, or is this really the only place where you talk about the responsibilities of --

MS. LUMELSKY: So if I'm understanding Your Honor correctly, there -- so all of the termination provisions, I understand it, are in 200.340.

THE COURT: But if that is a subpart, if you look at the regulatory heading --

MS. LUMELSKY: Right.

THE COURT: Unfortunately, I don't have it --

MS. LUMELSKY: Remedies for Noncompliance.

THE COURT: Remedies for Noncompliance. It's a subheading under Remedies for Noncompliance. In other words, it seems to me -- and, again, I can't go very far with that; but it seems to me that's the section where we're talking about the grant failing, as opposed to a section which would talk about the grantor's rights.

And I'm just wondering if there's a different section of the regs that talks about the -- sort of the other side of it, which isn't the grantee failing, but the grantor retaining certain rights in any event, which I'm sure they do.

MS. LUMELSKY: "The grantor" meaning the federal agency?

THE COURT: Yes.

MS. LUMELSKY: My understanding is that it's all within this provision because it's -- it talks about a variety of reasons that -- for termination and where there's a failure to comply with terms and conditions; but then it also talks about there might be agreement between the agency and the recipient on termination where there's not necessarily noncompliance of any kind, but just an agreement.

And it also talks about the recipient just deciding that they want to terminate and then a decision being made about what to do with the rest of the grant, for example. So my understanding is that this is -- this is the language. This is the relevant portion for the -- that discusses termination.

THE COURT: Are you familiar with any other provision? For example, there's no money anymore, "We're not going to be able to pay your grant because we don't have money." Is there such a provision?

MR. PEZZI: I confess that I do not know the answer to the question of whether there's a specific provision that covers that circumstance. I am quite certain the government would take the position that, if there's no money anymore, it need not pay the grant.

THE COURT: I'm sure they would. And I just would wonder if there's a different section where that would be in.

Okay. I cut you off.

MS. LUMELSKY: No, Your Honor. Just -- just going back to 2020, I think this is very important because that's when they described what the purpose of this language was, and there wasn't anything in what they said about changed priorities.

And just following up on where I was going about the surrounding revisions that were being made at the same time, there was a strong focus on making sure that there was a match between the original -- between the award and the original objectives.

And they specifically say that those objectives are developed during program planning and design and before the notice of funding opportunity is announced. And then they say that it's important to develop a strong plan and design to set the stage for demonstrating program results.

And then there are a number of sections; for example, 200.202 was a new section that was added at the same

time. And it talks about developing strong program goals. And then there's a specific link between the termination provision and another section called Performance Measurement. That's 200.301.

And it says that the agency must measure the recipient's performance to show achievement of program goals and objectives, and it specifically ties those goals and objectives to the original planning and design that -- what was done before the notice of funding opportunity was sent out.

THE COURT: So let me stop you there for a minute and ask the government counsel: The language that these grants are being -- the language that's at issue refers to both program goals and priorities, right?

Would you agree that, at least as to program goals, that's what's been laid out in the earlier documents in the proceeding of getting a grant? The notice for funding, the grant application, the performance measurements -- they all seem to me, as I read these Sections 200, 300, and so on, that the program goals are supposed to be laid out, and then measured against and that those can't be changing.

Would you agree with that?

MR. PEZZI: Respectfully, I don't think I agree with that as an abstract principle, but I don't think the Court needs to decide that here. The program goals, to be

sure, are --

THE COURT: Well, I need to interpret these words. And if I have "program goals" written all the way through the regs, why wouldn't I use how it's used throughout so I don't have a different interpretation here than every other section?

MR. PEZZI: Sure, Your Honor. I'll try to answer it this way: I think program goals is a narrower category than agency priorities on its face and that program goals is about, you know, a specific program, typically.

Program goals, too, I think can change, and I don't think there's anything in the regs that say to the contrary, although I think even if we are wrong about that, I think, if anything, that helps the government's position overall because agency priorities, which I understood plaintiffs' challenge to be almost entirely focused on the agency priorities half of that clause in any event, agency priorities are certainly at a higher level of generality and can change whether or not a program goal stays constant.

So presumably at many agencies, although agency priorities change frequently from administration to administration, many of their program goals would presumably stay the same. So I don't think it is necessarily the case that a program goal could never change. I think that would be too broad and too blanket of a statement. But I think,

ultimately, the -- to the extent there's a difference between those parts of the reg, it ultimately supports the government's interpretation.

THE COURT: So the notice of funding opportunity, that's what goes out before a grant is awarded; is that correct?

MS. LUMELSKY: Yes, Your Honor.

THE COURT: Yes?

MR. PEZZI: Yes, typically, Your Honor, as I understand it.

THE COURT: Okay. And so I'm looking at -- I guess, it's Appendix I, full text of Notice of Funding Opportunity, and it says what the notice of funding opportunity has to include.

And so when you're listing the notice of funding, a brief description, there's an executive summary, the agency contact, who would be eligible. And then program description, you have to contain the full program description of the funding opportunity.

And then under that, the section must include the following: the general purpose of the funding, what it is expected to achieve for the public good, the federal agency's funding priorities or focus area.

So you're putting this notice out, and the notice says, "Here's our priorities, and here's our program goals."

People apply for the grants. They're awarded the grants. But you're saying that, even though you're awarded the grants on a notice of funding opportunity that specifies program goals and agency priorities, those can change after the grant is awarded, as to that grant. Clearly, they can change for the next grant; but for that grant, they can change retroactively.

And if that's the case, why would you have to include them in the notice? Why would it matter? Why would this application go in if the program goals can change all the time during the life of the grant?

MR. PEZZI: I still think it would serve a valuable purpose, and the reg writers are entitled to conclude that setting out that information at the time the grant is awarded is useful to the process of attracting qualified -- sorry, Your Honor.

THE COURT: Why is it useful? If -- let's say you put out a grant; and on day one, you say the purpose of this grant is to eliminate world hunger, and everyone applies. And then on day two, after you've gone through this whole process, you say, well, actually, the purpose of this grant isn't eliminating world hunger; it's, you know, building skyscrapers. I don't know.

I mean, why would you put in a purpose and a priority if the person who applies for the grant and maybe

gets in, gets it and commits to it, all of those things change? And it doesn't say, "Here are the program goals subject to change," or "Here's the funding priorities subject to change," right?

MR. PEZZI: So, I mean, I think, Your Honor, even the language that Your Honor read is about the expectations of the grantor, which, obviously, expectations may change.

I think more relevant to this case, though, I mean, I think even if Your Honor were to conclude that program goals are locked in permanently based on the goals that are set forth or announced or even the program priorities that appear in certain notices of funding opportunities, the question in this case is about agency priorities.

THE COURT: Well, those words are "agency funding priorities." What I'm saying is: Why can't I interpret the words in this reg consistent with the same words showing up elsewhere? And I agree with you it doesn't say "agency priorities." It says "agency funding priorities." But given that we're talking about the funding of a grant, I think you maybe can read those the same, no?

MR. PEZZI: I respectfully don't think I can agree that those are the same. I think agency priorities are at a high level of generality, and they change quite often from administration to administration. And we think that this reg is intended to capture those possible changes in agency

priorities.

And those changes can happen even when program goals are constant or funding priorities are constant. Agency priorities can and do change, and we think the most natural reading of the regulation captures that possibility.

Now, often, of course, they won't change; and in many respects, even after a change of administration, grants are retained, as many have been here.

THE COURT: So if you were applying for a two-year grant, are you saying you better be careful not to do it during an election year because you're going to hire up a team, but then the grant's going to go away? I mean, I sort of envision -- and tell me if I'm wrong, but there's a way that a grant is a contract.

MR. PEZZI: Yes, Your Honor. In many respects, a grant is a contract.

THE COURT: And the United States honors its contracts.

MR. PEZZI: Yes, Your Honor.

THE COURT: And so even though you have an administration saying, "We would never have given this particular grant, and we're not going to renew it" -- and grants are often quite short term because it gives the granting agencies that flexibility to do that, to renew it or not renew it -- to say every political change means all of

our contracts don't apply anymore?

MR. PEZZI: Respectfully, Your Honor, that is not what we are saying. We are saying that a grant may be terminated, quote, "by the federal agency, pursuant to the terms and conditions of the federal award" -- which is one limitation -- "including to the extent authorized by law" -- another limitation -- and then, as relevant here, quote, "if an award no longer effectuates the program goals or agency priorities."

THE COURT: Which have now changed. Why isn't it -- I mean, I don't mean to be overly simplistic, but I'm going to go to Contracts 101. Why isn't it an illusory contract if the government can simply say, "We changed our mind about awarding this type of a contract"?

MR. PEZZI: Respectfully, Your Honor, it is not an illusory contract --

THE COURT: Why?

MR. PEZZI: -- because there's extensive consideration on both sides. The fact that there is discretionary termination authority for one party is actually quite common in binding contracts, including in the private sector, you know, termination without cause provisions of that sort.

THE COURT: Sure. You have contracts that are terminable at will all the time, but this is not being

presented as terminable at will. I mean, then you just wouldn't even need all of these clauses. You would simply say, "Here is the money for as long as we want to give it to you, and then it will stop."

MR. PEZZI: Yes, Your Honor. And so, I mean, I think that proves my point, which is that this is not an illusory contract. It is governed by these regulations and by other legal constraints.

Now, what Your Honor, I think, is getting at is this regulation gives a lot of authority to the grantor to terminate a grant for a wide variety of discretionary reasons.

THE COURT: Well, for any and -- for -- without -- without any reason, really; that it's to say -- if you can say -- an agency priority at that level of abstraction, you can simply say, "We don't want to fund it." That's an agency priority now.

MR. PEZZI: I don't think that is our position here, that it can be terminated for any reason or without any -- I mean, we -- to be clear, we believe that these regs need to be complied with absent some sort of --

THE COURT: But what's the difference? I mean, how -- if I have a grant and I need to decide to hire somebody tomorrow under this grant, do I have any assurance in any way that this grant is going to continue in another

month? Because if, as I understand the government's view here, if you decide you don't want to fund this anymore, it's done.

So I don't understand the hoops you're saying they would have to comply with. I mean, I guess there's notice of how much time and so forth; but you're basically saying we can just change whether we want to fund it anymore mid-contract.

MR. PEZZI: I mean, I -- look, if the bottom line premise that Your Honor is getting at is that the government, under its interpretation, retains a lot of discretionary authority to terminate grants --

THE COURT: Not a lot, all. There is no -- I mean, that's what I'm saying. It's not an illusory contract because you're paying for what services have been performed. But it is an at-will contract. And to suggest that grants are at will, terminable at will by the government, I don't think comports with anybody's understanding of how these work.

MR. PEZZI: So I respectfully disagree with that proposition as well, Your Honor. I think it's actually --

THE COURT: So you would agree that they are terminable at will? That is your view?

MR. PEZZI: No, Your Honor. We -- we -- the regulations that govern the termination process are set forth

in this regulation here that we are talking about. Now, there are other general contract principles, like termination for convenience, that are common in the contracting space, so I --

THE COURT: But here, on a grant, you keep saying, "Well, we're going to comply with this. It's not just terminable at will." But you're not telling me what would be the stopgap, where you couldn't just terminate it, under your -- under your construction.

MR. PEZZI: If the grant continues to effectuate program goals or agency priorities, then this termination would not provide --

THE COURT: But "the agency goals as we state them on any given day." So, yes, as long as we wanted -- that's what I'm saying. That's an at-will contract. That's, like, saying you can keep working here as long as your service is good to me; and if -- and if I don't want you here anymore, you go. I want to hire my sister instead, you go. There's no rules about it.

And here you're saying, as long as it pleases us, we're fine. But if we want to change what it is that we -- if we don't want to do this anymore, we can do it. And that, to me, means terminable at will.

MR. PEZZI: So whether we call it "terminable at will" or whether we call it something else, I think I, again,

agree with Your Honor that the government's interpretation is that it has significant discretionary authority to terminate grants and, as relevant here, when they no longer effectuate program goals or agency priorities.

I don't think it is surprising or legally problematic in any way that, in the government contracting space, the government retains a lot of authority to terminate its contracts, if we're thinking about a grant as a contract. That is common and lawful, in the government's view.

THE COURT: I think my -- the difficulty here for me in the position is the gap between "retains a lot of authority" and "retains all authority." The difference between terminable at will and terminable with some limitations. And I don't hear you giving me any limitations. I hear your interpretation being terminable at will, essentially; "We change our priorities, we cancel the grant."

MR. PEZZI: I have no limitations to offer other than what is in the text of this regulation and the government's interpretations of it, Your Honor.

THE COURT: Okay. I just have a few more minutes, but let's switch back to the challenges to Counts 2 and 3, to the extent that we didn't touch on them. I think you said that there were a few challenges that weren't applicable to Count 1. So if you want to --

MR. PEZZI: Yes, Your Honor. I think everything we

just discussed would also apply to Count 2. Count 2, I think, seeks maybe a slightly different form of relief than Count 1, but all of the justiciability arguments and the merits arguments that we've already addressed I think would be equally applicable to Count 2, the only real difference being, of course, plaintiffs are not seeking relief on Count 2 at this time.

Count 3 is a challenge to the regulation itself on the theory that, if it means what the government says it means, then it violates the APA or is arbitrary and capricious. We, obviously, disagree with that too, including for the merits reasons that we just discussed.

The only additional threshold argument that we have that applies to Count 3 but does not apply to Counts 1 and 2 is we have a waiver and forfeiture argument due to plaintiffs' failure to advance any of these concerns during the rulemaking process.

THE COURT: And what's your answer to their contention of, "Well, we couldn't raise them then because nobody was interpreting it this way"?

MR. PEZZI: So I'd say two things about that: One is they absolutely could have raised it then, even if no one else was thinking of this issue; two, they themselves were thinking of this issue as early as 2020.

And so plaintiffs, you know, their entire merits

presentation was about the preamble to the 2020 rule, which to be clear is not the rule at issue here, but it did announce similar regulatory texts than the texts that Your Honor is ultimately interpreting in this case.

But in that rulemaking, I believe, it was Illinois and Minnesota both raised more or less the same sort of questions here and expressed concerns. We quote the comment from one of the two states in our reply brief.

And so the idea that no one could have possibly contemplated that the reg would have been interpreted this way I think is significantly undermined by the fact that two of the very plaintiffs in this case seemed to contemplate that very sort of thing, at least in the 2020 rulemaking.

And then none of the states, including Illinois and Minnesota, brought any of these concerns to the agency's attention during the rulemaking at issue here during the Biden administration. And so I think especially whereas here their argument on Count 3 is mostly about, you know, a failure to explain or a failure to respond to the concerns that they have raised, we don't know whether they would have explained or responded to these concerns if they had presented them during the rulemaking process.

So that -- I mean, that's the only threshold argument, I think, we have that applies to Count 3 that doesn't apply to Count 1 and 2.

THE COURT: I realize I did have one other set of questions. I couldn't tell to what extent the parties are agreeing and disagreeing here.

Plaintiffs are saying that there are three -- there's sort of preenforcement challenge to the current regs. The one is what we've been talking about the whole time. We were talking about the merits, "may not be used to terminate existing grants based on new agency priorities."

The second was "may not be used where the effect would be defendants withholding of appropriated funding based on priorities contrary to congressional directives." Is that argument still live in front of me?

MR. PEZZI: We don't think so, Your Honor. I mean, to be clear, the government agrees that it has to comply with federal statutes and applicable federal regulations.

MS. LUMELSKY: Yeah, in our view, they've essentially conceded on that point, and it's not at issue.

THE COURT: And then, third, that termination, based on the termination clause, would be improper if the clause essentially wasn't included back in the grant; and is that one still in front of me?

MS. LUMELSKY: So our argument on that point was with respect to both the 2020 and the 2024 regulations, and it sounds like there's a little bit of a dispute with respect to 2020.

THE COURT: Why do I care about 2020?

MS. LUMELSKY: We do have still-existing grants under -- that were granted at that time, so potentially it could be relevant with respect to those grants.

THE COURT: Okay.

MS. LUMELSKY: And we did --

THE COURT: And what -- the issue -- what's the issue with 2020 that's not there with 2024? Because 2024 says it's going to be included, right?

MS. LUMELSKY: Yes. I believe that -- and the government can speak to this. My understanding is that there's -- within the 2020 version, it said "should" as opposed to "must"; although, if you look at the discussion when the rule was introduced, it had the same kind of requirement listed there.

So if you look at the rule with the -- how it was introduced by OMB, it's clear that it was mandatory at that time as well.

THE COURT: Is the government contending otherwise?

MR. PEZZI: Yes, Your Honor. So this is addressed at page 18 to 20 of our reply brief. Plaintiffs, for the first time in their reply brief, raised this question about the 2020 version of the regulation and how it uses "should" instead of "must." And plaintiffs' view is that "should" should be interpreted to mean "must."

That is an argument that we would have addressed at length far earlier if we thought it was a part of the complaint in this case. It also does not appear in plaintiffs' opening brief.

The government brought this wrinkle to the Court and to plaintiffs' attention just in a footnote in its own opening brief in the interest of candor and completeness to show why plaintiffs' sort of high-level challenge might be missing some important distinctions between particular grants subject to particular regulations at particular times.

So, I mean, we absolutely think the fact that the 2020 version of the relevant regulation uses the word "should" and the one that we thought was at issue in this case uses the word "must" reflects a meaningful difference between the 2020 and the 2024 versions of the reg.

But for the reasons we state in our brief, we don't think our reply brief is an appropriate time to raise a new theory of relief, and so our primary submission on that is that the argument is waived.

THE COURT: So -- hold on a minute. The --

MS. LUMELSKY: Can I speak to that waiver point, Your Honor?

THE COURT: Sure.

MS. LUMELSKY: In our complaint, from the beginning, we've defined the clause to mean both the 2024 and

the 2020 version. If you look at footnote 1 of the complaint, it says that when we're talking about the clause, we're referring to both. And that -- and that was true in our briefing as well. We've made very clear throughout that we were talking about both versions.

THE COURT: So --

MS. LUMELSKY: So I guess I'm confused by the waiver argument. We've been clear from the beginning on that point.

THE COURT: So when you're asking -- and I thought I had printed out your -- it's probably left on my desk -- the proposed declaratory judgment that you were looking at, is that asking for declaratory judgment as to both of the regs?

MS. LUMELSKY: Yes, and it does say that in the -- with respect to the requests for relief.

THE COURT: Okay. So two is gone. Three, I have to figure out.

And -- all right. Well, I'll go and read the arguments there. It's page 18 to 20 of the reply. And where in the sur-reply? I think that's what you were giving me with the cites before.

MR. PEZZI: Yeah, it's page 18 to 20 of defendants' reply, is where defendants' argument on this wrinkle is included. And I think plaintiffs' last brief, which is

ECF 98 -- not to speak for plaintiffs --

MS. LUMELSKY: Yes.

MR. PEZZI: -- it's page 29 to 31.

MS. LUMELSKY: Thirty-one.

But we do think it's a fairly simple argument based on just looking at the rule in combination with the OMB's discussion of it, that it's -- that it's required just as it was in 2024.

MR. PEZZI: Unsurprisingly, Your Honor, we very much disagree with that. I'm happy to address it now. I'm happy to let Your Honor review our papers, however the Court wishes to proceed.

THE COURT: I think it's probably more efficient for me to go back and look at your papers and not make you redo it right now.

Oh, here. I have it right in front of me, this proposed order.

So -- so I didn't understand -- I saw the definition of "clause" as being both of those, but I always think of a reg as superseding the prior reg. And so are you saying that termination -- if someone was to terminate a current grant, they would terminate it under the old reg, not the new reg?

MS. LUMELSKY: Well, we -- at least potentially, there could be an issue there.

THE COURT: But is there? I mean, talk about ripe or not ripe. I mean, I just couldn't -- I understand what you're saying now, that when the grant happened, this was the reg in place. And then you're saying to me there are grants which were issued prior to 2024.

But wouldn't the case -- wouldn't it be the case that if the government was going to terminate the grant, they would follow the current reg? Am I wrong about that?

MR. PEZZI: So I think I have a very partial agreement with plaintiffs on this. I mean, I do think it is theoretically possible that there are some older regs, that the termination of those older regs would be governed by the terms and conditions of those older grants, which might incorporate by reference --

THE COURT: Wait. The other way around. The termination of the grants --

MR. PEZZI: Sorry. You're right. Yes.

THE COURT: -- would be based on the regs that were in place at the time the grant was issued?

MR. PEZZI: Is my understanding, that that is typically the case, that when these new regs are issued, they govern the termination of grants issued after those regs.

THE COURT: Okay.

MR. PEZZI: So I think --

THE COURT: So both of you agree on that? So then

it is -- it is a current reg that -- both the 2020 and the 2024 reg you're asking for an interpretation of?

MS. LUMELSKY: I mean, certainly if the government were to say that the 2020 reg doesn't -- isn't -- wouldn't matter, then we wouldn't need any relief on that; but to the extent the government is saying that it potentially could matter, then we do need relief on that.

MR. PEZZI: The last thing I will say about this, other than, you know, referring Your Honor to the materials in our papers which address some of these very nuances, is -- I mean, not to redo all of our standing and ripeness arguments, but we would be talking about a real theoretical possibility now that a grant that has been in effect for many years across multiple administrations that, including in this administration, there was apparently no desire to terminate, might be terminated at some uncertain point in the future in reliance on a reg that is no longer in effect --

THE COURT: Well, I would assume, if we go through the grants that they've already terminated, most of those started before the 2024 reg. I mean, that's -- maybe not. Maybe some of them are just right after '24, but just because of the timing.

MR. PEZZI: I don't know the full universe of numbers there. I mean, I will say it is presumably a -- it is a closed and dwindling set of grants for which this could

possibly theoretically matter. I mean, we're not saying there's, you know, no possibility that that could happen.

I mean, we think, you know, the fact that plaintiffs' merits argument on this point, like their merits argument on the other points, has very little to do with the text of the reg and a lot to do with the preamble we think is telling.

And, also, their -- the idea that it is preserved because it is -- there's, like, a footnote in the complaint that we should have understood that we were talking about multiple regulations, even though plaintiffs never addressed this "should" versus "must" issue in any brief before, I think it's clear that the argument is not preserved and, in any event, is meritless.

But, again, those issues are addressed in the papers; and so unless Your Honor has further questions about that, I'm happy to stand on those.

MS. LUMELSKY: Your Honor, just on the text, if Your Honor would like me to speak to the text, we think that it supports our argument here, and I'd be very happy to talk about that if that would be helpful.

THE COURT: Is it in your brief?

MS. LUMELSKY: It is in our brief.

THE COURT: It is in your brief?

MS. LUMELSKY: Yes. But just to be clear, contrary

to the government's arguing, our argument here is not based solely on the regulatory history. We think that the text here strongly supports our argument here as well.

THE COURT: Okay. I think that's -- the question of the Kansas governor, I was trying to think about, if the attorney general is unhappy about the governor proceeding here, whether the proper way to proceed is some state court action enjoining the governor or something of the sort.

It's a little odd to have that in front of me through -- I don't think it gets to me by an amicus brief. You've dropped a footnote. You've mentioned three states. Two of them gets nowhere because there's no authority there. The one tries to incorporate by reference the amicus brief.

I -- I don't like leaving an issue unresolved, but it does feel like it's not squarely in front of me.

MR. EHRLICH: I'm happy to speak to that. I think -- and the other side, my friend on the other side, can correct me if I'm wrong. I think you don't have to reach that if you find standing for the other plaintiffs.

I will say, to Your Honor's point, that did come up in state court. I can give you the Westlaw citation: 2026 WL 845727, where the Kansas attorney general admitted that the governor -- this is a quote -- "governor is empowered to litigate on behalf of the legal interests of her office and those of the executive agency she oversees."

That includes the department -- that Kansas Department of Agriculture and Department of Health and Environment, which were harmed by the grant terminations here. So I think the AG -- our view is that the AG had basically conceded in that litigation that the governor can represent the agencies that she oversees, so --

THE COURT: Was that related litigation?

MR. EHRLICH: No, no, no. It had -- this issue came up about when the governor can represent the state, versus the attorney general. And so it came up in that context, so that -- that's the only thing I would say there, Your Honor.

THE COURT: If I don't have to reach it, I'd probably rather not.

MR. EHRLICH: I agree.

THE COURT: Okay. I think that's all I have. I will try to get something out soon. And I thank you for your good arguments.

MR. PEZZI: Thank you, Your Honor.

THE DEPUTY CLERK: We are in recess.

(Court in recess at 2:23 p.m.)

**CERTIFICATE OF OFFICIAL REPORTER**

I, Robert W. Paschal, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 14th day of May, 2026.

/s/ Robert W. Paschal

ROBERT W. PASCHAL, RMR, CRR
Official Court Reporter